[973 NE2d 711, 950 NYS2d 301]

JASMINE ZHENG et al., Appellants, v CITY OF NEW YORK et al., Respondents.

Argued May 31, 2012; decided June 26, 2012

## POINTS OF COUNSEL

*Legal Aid Society*, New York City (*Steven Banks, Jane Sujen Bock, Joshua Goldfein* and *Judith Goldiner* of counsel), and *Weil, Gotshal & Manges LLP* (*Konrad L. Cailteux, Isabella C. Lacayo, Jesse Morris, Emily L. Pincow* and *Lisa Sokolowski* of counsel), for appellants. I. The First Department erred as a matter of law when it applied the wrong standard in determining that there was no mutual assent to contract. (*Brown Bros. Elec. Contrs. v Beam Constr. Corp.*, 41 NY2d 397; *Mencher v Weiss*, 306 NY 1; *Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.*, 93 NY2d 584; *Ahlstrom Mach. v Associated Airfreight*, 272 AD2d 739; *TAJ Intl. Corp. v Bashian & Sons*, 251 AD2d 98; *Accurate Realty, LLC v Donadio*, 80 AD3d 1041; *Keis Distrib. v Northern Distrib. Co.*, 226 AD2d 967; *Conopco, Inc. v Wathne Ltd.*, 190 AD2d 587; *Baum v County of Rockland*, 337 F Supp 2d 454; *Merritt Hill Vineyards v Windy Hgts. Vineyard*, 61 NY2d 106.) II. But for the First Department majority's misapplication of the legal standard for mutual assent, the Advantage tenants would have prevailed. (*Greenfield v Philles Records*, 98 NY2d 562; *Flores v Lower E. Side Serv. Ctr., Inc.*, 4 NY3d 363; *De Kovessey v Coronet Props. Co.*, 69 NY2d 448; *Joseph Martin, Jr., Delicatessen v Schumacher*, 52 NY2d 105; *Matter of 166 Mamaroneck Ave. Corp. v 151 E. Post Rd. Corp.*, 78 NY2d 88; *Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.*, 93 NY2d 584; *Cobble Hill Nursing Home v Henry & Warren Corp.*, 74 NY2d 475.) III. Social services programs can be operated through contracts with third parties. (*Marks v City of New York*, 121 Misc 2d 303; *McNeill v New York City Hous. Auth.*, 719 F Supp 233; *Mutual Hous. of Tompkins County, Inc. v Hawes*, 4 Misc 3d 247.)

*Michael A. Cardozo, Corporation Counsel*, New York City (*Eric Rundbaken, Allan G. Krams, Nancy F. Brodie, David Cooperstein* and *Michael Adler* of counsel), for respondents. I. This Court cannot reweigh the evidence that led the trial court and Appellate Division to conclude that the City of New York did not contractually obligate itself to continue paying plaintiffs' Advantage rent subsidies after the Legislature decided to cut off the bulk of the program's funding. (*Brown Bros. Elec. Contrs. v Beam Constr. Corp.*, 41 NY2d 397; *Rudman v Cowles Communications*, 30 NY2d 1; *Farrell Lines v City of New York*, 30 NY2d 76; *Levine v Shell Oil Co.*, 28 NY2d 205; *Cohen v Hallmark Cards*, 45 NY2d 493; *Jacobellis v New York State Thruway Auth.*, 51 AD3d 976.) II. The Appellate Division applied the *Brown Bros. Elec. Contrs. v Beam Constr. Corp.* (41 NY2d 397 [1977]) standard, not one based on subjective intent. (*Sokoloff v National City Bank of N.Y.*, 239 NY 158.) III. The trial evidence is legally sufficient to support the finding that the City of New York did not enter into contracts in the Advantage program. (*Seif v City of Long Beach*, 286 NY 382; *Matter of New York State Med. Transporters Assn. v Perales*, 77 NY2d 126; *Rock Island, A. & L. R. Co. v United States*, 254 US 141; *Marks v City of New York*, 121 Misc 2d 303; *Mutual Hous. of Tompkins County, Inc. v Hawes*, 4 Misc 3d 247; *Richardson v Belcher*, 404 US 78; *Matter of Judge Rotenberg Educ. Ctr. v Maul*, 91 NY2d 298.) IV. The Advantage certification letter did not constitute an offer that could be accepted and create a contract with the City of New York. (*1240 Third Ave., Inc. v Birns*, 232 App Div 522; *Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.*, 93 NY2d 584; *Carmon v Soleh Boneh Ltd.*, 206 AD2d 450; *De Kovessey v Coronet Props. Co.*, 69 NY2d 448; *Paige v Faure*, 229 NY 114.) V. Even if the City of New York had contracted with Advantage landlords, it retained discretion not to continue Advantage subsidies for a second year. (*Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib.*, 2 NY3d 249; *Jiggetts v Grinker*, 75 NY2d 411; *Matter of Natural Resources Defense Council v New York City Dept. of Sanitation*, 83 NY2d 215; *Matter of Marro v Bartlett*, 61 AD2d 729, 46 NY2d 674; *Matter of Riches v New York City Council*, 75 AD3d 33, 15 NY3d 735; *Brown v Manufacturers Trust Co.*, 278 NY 317.)

*Gibson, Dunn & Crutcher LLP*, New York City (*Randy M. Mastro* and *Christopher Muller* of counsel), for Sanctuary for Families and others, amici curiae. I. The City of New York designed Advantage to convince participants that payments

were assured. (*Brown Bros. Elec. Contrs. v Beam Constr. Corp.*, 41 NY2d 397.) II. Domestic violence victims forced out of Advantage housing will be at serious risk of violence and other harm.

### OPINION OF THE COURT

READ, J.

Plaintiffs claim that the City of New York is contractually obligated to pay rent subsidies to their landlords under the Advantage New York program until expiration of their leases. State and federal reimbursement for two thirds of the Advantage program's costs ended on April 1, 2011, causing the City to discontinue it as of that date. Both lower courts found that the City did not intend to enter into enforceable contracts with plaintiffs or their landlords under the Advantage program, and the record supports this affirmed finding of fact (*see Brown Bros. Elec. Contrs. v Beam Constr. Corp.*, 41 NY2d 397, 400 [1977]). Accordingly, we affirm dismissal of the lawsuit.

### I.

The City created the Advantage rental assistance program in 2007 to help homeless single adults and families achieve independent living. The Advantage program replaced and was designed to fix unanticipated problems thought to compromise the effectiveness of a predecessor program called Housing Stability Plus (HSP). HSP provided a five-year rent subsidy that was reduced automatically each year by 20%. Participants in HSP were required to remain eligible for public assistance (PA) and to comply with all PA requirements. Two problems became apparent over time as a result. First, some tenants limited the hours they worked because a higher income would render them ineligible for PA and, consequently, the HSP rent supplement. Second, landlords grew reluctant to participate in this program because subsidies were cut off whenever a tenant's PA case was sanctioned or closed, thus interrupting the flow of rental revenue.[1] Under the Advantage program, by contrast, landlords were assured that changes in a tenant's PA status would not disrupt payment of the rent subsidy over the course of the lease.

---

1. At the trial in this case, a real estate broker specializing in apartment rentals testified that "[c]llients kept on falling off [PA] eligibility status in the middle of the program and landlords stopped getting paid and because of that, they just shied away from the program [—] they said don't bring HSP, not interested."

There were various versions of the Advantage program, with differing eligibility requirements. For example, the program made rent subsidies payable to landlords for households where at least one adult worked 20 hours or more weekly at minimum wage or above (Work Advantage), received a fixed income benefit such as Supplemental Security Income or Social Security Disability Insurance (Fixed Income Advantage) or had an active case with the City's Administration for Children's Services while in shelter (Children Advantage). In general, the family or single adult had to have resided in shelter for a certain number of days, and have an active PA case and a gross household income not exceeding a specified percentage of the federal poverty level.

The Advantage program was carried out through a lease between landlord and tenant to which the City was not a party, and four documents drafted by the City: a certification letter, participant statement of understanding, landlord statement of understanding and lease rider. These four documents differed depending on the program type and participant (family or single adult), vintage or agency, but contained the same basic provisions. The Advantage program was approved by the State's Office of Temporary and Disability Assistance (OTDA), as required by state regulation (see 18 NYCRR 352.3 [a] [3] [ii] [a social services district may, with OTDA's prior approval, provide an additional shelter supplement for PA recipients to reside in private housing, provided OTDA "determines that there are sufficient funds available to provide such reimbursement"]).

The City's Department of Homeless Services (DHS) and Human Resources Administration (HRA) jointly administered the Advantage program. To begin with, the City provided eligible individuals or families with a certification letter on DHS or HRA letterhead, which was routinely signed by city workers from these agencies, sometimes by facsimile rather than original signature. Several versions of this letter included the following subject line in boldface type: "Re: Advantage Program (Guaranteed Rent Not Tied to [PA])."

The certification letter generally informed recipients that they were "now eligible for the Advantage rental assistance program"; and set out the certification and expiration dates, the length of time that the certification would be valid, the total maximum rent allowed, the monthly tenant contribution (based on total gross household income as of the certification date) and the maximum subsidy amount. The letter also stated that "[t]he Advantage program guarantees that the subsidy portion of the

rent will be paid directly to your landlord for one year," and that a "second year of rental assistance under Advantage" was available if the tenant met the eligibility criteria. Recipients were encouraged to show the letter to prospective landlords and brokers when searching for apartments.

At lease signing, the tenant subscribed a participant statement of understanding, which indicated that "[u]nder the Advantage Program, [the City] will pay a portion of my monthly rent (over and above [the tenant's] monthly rent contribution) directly to my Landlord." As a "condition" of "participation" in the program, the tenant made 22 "commitments," which included understandings and agreements to file for work supports and tax credits, notify HRA of a change in address, seek appropriate services to maintain the tenancy, repay the security deposit and certain other payments if failing to move into the apartment after signing the lease, cooperate with the City in its administration of the program and take part in program surveys and publicity. The participant statement was signed by adult household members, who represented that they had "read and under[stood their] obligations under [the participant statement]"; and by a city case manager and/or housing specialist, who "confirm[ed] that all present adult household members have verbalized their understanding [of] the agreements outlined in this document, and that all adult household members have signed and received a copy of this agreement."

Also at lease signing, the landlord (or an authorized representative) subscribed a landlord statement of understanding, which specified that the City "will issue" or "will pay" rent subsidies directly to the landlord on behalf of the tenant, who remained "responsible for paying directly to . . . the Landlord, a monthly rent contribution" in a specified amount "to cover the remaining portion of the rent under the Lease and Rider." Further, as a "condition" to "participation" in the program, the landlord made 12 "commitments," which included understandings and agreements not to charge an Advantage tenant "any amount" beyond the agreed-upon rent; and to offer the apartment at the same level of rent for a second year, pay for heat and water and, in the event an Advantage tenant vacated the premises "due to an eviction or move," return any prepaid rent to the City or, at the City's option, allow another program participant to reside in the apartment for the remainder of the lease's term.

Lastly, at lease signing the tenant and landlord both signed a rider to the landlord's standard lease. In the rider, the tenant

"agree[d] [to] authorize[ ]" the City to pay "rental assistance directly to the Landlord."[2] The rider also generally reiterated the landlord's obligations set out in the landlord statement. Additionally, the landlord "acknowledge[d] that . . . the amount and duration" of subsidies was "subject to all applicable rules and requirements" of the Advantage program, and agreed to make the apartment available for inspection. If the landlord "materially violate[d]" any of the terms of the lease or rider, the tenant could terminate the lease, and the landlord was barred from participation in the program. A city worker signed the lease rider as either a DHS or HRA witness.

The Advantage program was funded in equal parts by the city, state and federal governments. But the Governor's executive budget for fiscal year 2011-2012, submitted to the Legislature on February 1, 2011, did not include an appropriation for the program. Although the City aggressively lobbied the State for the Advantage program's continuation, funding was not restored in the subsequently enacted state budget; once state financial support was withdrawn, federal moneys were also no longer available. Faced with the imminent loss of two thirds of the program's funding, the City closed the Advantage program to entrants in mid-March 2011, and informed participants that their rental subsidies would end on April 1, 2011, the beginning of the State's fiscal year.

On March 28, 2011, plaintiffs Jasmine Zheng and A.T.,[3] on behalf of themselves and all others similarly situated, brought this lawsuit against the City as well as DHS and HRA and their respective commissioners (collectively, the City). Plaintiffs alleged that they were "Advantage recipients, now Advantage tenants," suing on behalf of themselves and a class consisting of "approximately 15,000 current Advantage Tenants," and claimed that the City was contractually obligated to continue to pay the rent subsidies provided for under the Advantage program. They sought specific performance of this alleged contract; a declaratory judgment that the City was "contractually obligated to continue to make Advantage subsidy payments

---

2. The tender of payments for PA is generally to be made directly to the recipient with exceptions, notably including "when the applicant/recipient *requests in writing* that vendor or protective payments be made" (18 NYCRR 381.2 [a] [emphasis added]).

3. Zheng later withdrew as a named plaintiff, although she has continued as a class member; the identity of A.T. has remained confidential throughout this proceeding because she is a victim of domestic abuse.

to Advantage Tenants' landlords for the remainder of [the alleged contracts] and for a second year if the Advantage Tenants [met the City's] eligibility criteria"; injunctive relief to prevent the City from discontinuing rent subsidy payments to landlords before expiration of the alleged contracts; and "injunctive relief to prevent [the City] from taking Advantage Tenants' property interests without due process of law." Basically, plaintiffs were looking for the City to subsidize their leases for a full two years, notwithstanding the loss in the interim of state and federal funding for this purpose. Supreme Court signed the accompanying order to show cause, thereby directing a hearing on plaintiffs' request for injunctive relief and class certification, and temporarily restraining the City from discontinuing the rent subsidies.

On May 2, 2011, Supreme Court entered a decision and order denying plaintiffs' motion for a preliminary injunction and the City's cross motion to dismiss the complaint (2011 NY Slip Op 31120[U] [NY County 2011]). Based on her review of the "program documents" (i.e., the certification letter, participant and landlord statements of understanding and the lease rider), the judge concluded that the complaint "survive[d]" the City's motion to dismiss, but that plaintiffs had not shown "a likelihood of success on their claims that the program documents constitute enforceable contracts" (id. at *26).[4] Supreme Court, however, continued the temporary restraining order for 10 days to permit plaintiffs the opportunity to seek a stay from the Appellate Division.

Plaintiffs filed a notice of appeal with the Appellate Division on May 10, 2011, and on May 12, 2011, they moved for injunctive relief. On June 2, 2011, the Appellate Division granted plaintiffs' motion "to [the] extent of directing [that the Advantage program] payments . . . be maintained pending hearing and determination of the appeal" (2011 NY Slip Op 74744[U] [2011]).

Following an expedited, five-day nonjury trial in June and July and the completion of posttrial submissions on August 11, Supreme Court issued a decision dated September 13, 2011 in which she held that

---

4.  Supreme Court also decided that class certification was "unnecessary at this time" in light of the City's agreement "to apply [her] determination equally to all similarly situated"; and therefore also denied plaintiffs' motion for class certification (2011 NY Slip Op 31120[U] at *25). Before the first day of trial, the City agreed to certification of the plaintiff class in this action.

"the Advantage program, no matter how laudable its goals, is nothing more than a social benefit program, which [the City] had the right to terminate based upon the lack of funding available for its continuation. [The City has] no ongoing obligation, contractual or otherwise, to continue the Advantage Program."

The judge observed that "[w]hile a social services program can be structured in such a way as to be operated and implemented through enforceable contracts," plaintiffs were required to prove by a fair preponderance of the evidence that, in this instance, enforceable contracts did, in fact, exist between tenants and the City or landlords and the City. She listed the elements required for contract formation and pointed out that the parties did not dispute "capacity to contract" or that "if the court were to find that [the City had] entered into enforceable contracts with the Advantage Landlords, the Advantage Tenants [would] have standing to enforce them as third party beneficiaries." She then turned to the two elements of contract formation disputed by the parties—mutual assent and consideration.

With respect to mutual assent, Supreme Court remarked that "[w]hile a formally executed document is not always necessary," the proponent of the existence of a contract—here, plaintiffs— "must still prove an intent of the parties to be bound." Citing our decision in *Brown Bros.*, the judge stated that "[i]n finding [intent to be bound], the court does not depend on the subjective intent of the parties, [but] rather . . . looks to objective manifestations of the intent of the parties as gathered by their expressed words and deeds." In undertaking this analysis, "[t]he parties' communicated expressions are interpreted objectively to give effect to the reasonable expectations of the parties, not necessarily their actual expectations." Further, "[t]he fact finder should not put disproportionate emphasis on any single act, phrase or other expression, but instead, should consider the totality of the circumstances, the situation of the parties and the objectives they were trying to attain."

After "viewing the evidence as a whole" in light of these principles, Supreme Court "conclude[d] that [the City] did not manifest an intent to be contractually bound to provide the benefits associated with the Advantage program." While the judge also expressed her belief that "neither the tenants nor the landlords manifested an intent to be contractually bound,"

she added that "it would not matter even if they did" because "the requirement of intent must be mutual." She then reviewed the proof that supported her finding that the City lacked the intent to be bound.

First, there were "no formal contracts" between the City and tenants or the City and landlords. As a result, plaintiffs relied on the four "program documents" (the certification letter, participant and landlord statements of understanding and lease rider) to argue that the City intended to be contractually obligated to fund plaintiffs' rent subsidies under the Advantage program. With respect to these documents, the judge addressed the parties' disputes over the importance of the presence of the signatures of city workers on certain of them. She determined that the "confirmation" signed by a city caseworker on the bottom of the participant statement "[did] not manifest any intent by [the City] to enter into a contractual relationship"; and neither did the signature of a city caseworker as a witness to the lease rider. She noted that the certification letter was "signed by NYC representatives," sometimes by facsimile, but, contrary to the City's arguments, "the fact that each signature was not original [was] not legally significant." Supreme Court added that "[w]hile [the City could not] rely on the lack of a signature on the certification letter to disprove its intention to be bound, the court still [would] need[ ] to look at the content of the documents and the circumstances of their making in determining mutual assent."

The judge described "language used in the program documents" as "[m]ost important" in ascertaining whether there was contractual intent, followed by "evidence in the form of collateral writings (e.g. promotional materials) and what the parties said and did at the time the program was implemented"; and "[t]he historical context of the formation of the relationships." She added that "the unexpressed subjective thinking of the parties at the time the program was implemented and/or the documents signed or generated" was "[n]ot relevant." Supreme Court then reviewed the program documents in detail.

The judge stressed the absence of such "traditional contract phrases" as " 'the parties agree' " or " 'the parties covenant.' " Instead, these documents consistently referred to Advantage as a "program." And while "[t]he documents [had] program 'conditions' for tenants and landlords . . . [t]he language [did] not expressly impose any mutuality of obligation on [the City]." Additionally, "representation[s] that [the City] will pay or will issue checks" merely "set[ ] out the program benefits" and were

"entirely consistent with the administration of the Advantage program," rather than "prov[ing] contractual obligations."

Supreme Court then considered the word "guarantee," which was "more problematic" for the City "because 'guarantee' is a contractual term, which generally refers to an obligation to be responsible for the debt of another." She added, however, that "there are times when, depending on the context of the use of the word, no binding obligation is created," so "[i]t is important . . . to understand the context in which [the City] used . . . the term guarantee in program or other documents." Here, the certification letter was the only program document to use the word "guarantee." Specifically, these letters typically included this word in the subject line—i.e., "Re: Advantage Program (Guaranteed Rent Not Tied to [PA])—and referred to the subsidies as being "guaranteed for up to one year." The judge noted that the word "guarantee" also appeared in promotional materials given to landlords and brokers.

Supreme Court then found that

> "[t]he use of the word guarantee was deliberate and made to induce landlords to participate in the Advantage rental assistance program. The word was used to differentiate the Advantage program from predecessor programs [i.e., HSP] where a disruption in a tenant's public assistance case, for any reason whatsoever, would interrupt the rental subsidy payments to a participating landlord. *Under the Advantage program, the guarantee was that the rental assistance benefit would be paid to landlords, even if the tenant's public assistance payment was interrupted for any reason.* This meaning was communicated to landlords and/or their representatives in meetings and fairs that [the City] held to induce landlords to participate in the program. The certification letters' references to guarantees of rent are expressly 'not tied to public assistance payments.' The program documents and the promotional material pervasively used language indicating that Advantage was a program, that rental assistance payments were benefits and that the tenants and landlords had to fulfill conditions to participate in the program" (emphasis added).

Thus, Supreme Court found that the certification letter and promotional documents "do not, when read as a whole, contain

a contractual guarantee of payment if the program is no longer funded." She called plaintiffs' argument that the City might have included language in the program documents stating that payments were contingent on continued program funding "a red herring" because "[t]his language would only be important if there was a contract between the parties" in the first place.

Supreme Court also assessed the evidence of the City's communications with landlords to promote the Advantage program, which belied any intent on the part of the City to be bound contractually. Specifically, the judge found that during meetings held by the City "to induce the landlords to participate in the Advantage program . . . landlords asked [the City] to obligate [itself] to the leases. Whenever these suggestions were made, [the City] made it clear to landlords that the lease obligations would be between the landlord and the tenant and that NYC would not obligate itself."[5]

The judge contrasted this objective contemporaneous evidence of the City's intent with the testimony of A.T. and her landlord at trial as to their after-the-fact professed subjective belief that they had entered into contracts with the City. Moreover, "[t]estimony by other landlords, real estate brokers and property managers[ ] indicates they either had no understanding about whether they had a contractual relationship with [the City] or they understood they had no such relationship." Indeed, "a real estate broker with extensive experience about rental assistance programs," who was called by plaintiffs, "testified that he did not believe [the City] had entered into contracts with individual landlords, and, further, that it never entered his mind to suggest that NYC sign a separate contract with the landlords."[6] She added, however, that "these varied subjective

---

5. While the judge discussed this evidence solely with respect to the City's intent, it also bears on the intent of landlords—i.e., why would landlords make these entreaties if, as the dissenters contend, "a reasonable person" in their position would have clearly understood that the City, by virtue of the program documents, "entered into a separate and distinct agreement with [them] to subsidize the rent obligations created by the leases" (dissenting op at 582)? Although the dissenters criticize Supreme Court for not undertaking the "vital analysis" of landlord intent (*id.*), the judge explained, as noted earlier, that once she found no intent on the part of the City, landlord intent did "not matter" because intent must be mutual.

6. In other words, although the dissenters assert that "a reasonable person in the position of the Advantage landlords" would have clearly understood that the City had contracted with them and, indeed, it would have been *"unreasonable"* to conclude otherwise (dissenting op at 580), the overwhelming

*(n. cont'd)*

understandings . . . [were] not probative on the issue of mutual assent."

Next, Supreme Court rejected plaintiffs' argument that the certification letter constituted an offer accepted by the tenants and landlords "by their actual participation" in the Advantage program because "it lack[ed] the requisite specificity": "the specific landlord was not identified, the specific apartment was not identified, the term of the lease was not identified, nor were all of the conditions, as otherwise stated in the participant statement, the landlord statement and lease rider."

Plaintiffs argued there was consideration for their alleged contracts with the City because "they entered into contracts with private landlords for rents that they could not otherwise afford," and "obtained employment and incurred expenses for such things as child care, all in connection with fulfilling their obligations" under the Advantage program. Supreme Court disagreed, though, "[s]ince participation in the Advantage program was required as part of continued eligibility [for] temporary housing"; therefore, "the tenants' requirements of eligibility for the Advantage program [did not] constitute[ ] consideration that would support a contract" with the City.

Further,

> "[the] argument[ ] that Advantage Tenants gave up other available housing and/or programs to participate in the Advantage program[ ] was never proven at trial. In fact, there was testimony . . . that the Advantage program was perceived as a means to fill what was then the prevailing time gap in the availability of section 8 housing."[7]

As the judge commented, while section 8 housing "was always

---

after-the-fact testimony was that landlords harbored no such illusion. While subjective understandings, as Supreme Court noted, are "not probative on the issue of mutual assent," it is impossible to reconcile the fact that actual participants in the Advantage program from the real estate community did not consider the City to be contractually bound with the dissenters' conclusion that "the Advantage program documents *unambiguously* memorialize[d] a bargained-for exchange between the City and the Advantage landlords to which [they] mutually assented" (*id.* at 579 [emphasis added]).

7. Section 8 of the Housing Act of 1937 (42 USC § 1437f), as repeatedly amended, authorizes a variety of rental assistance programs on behalf of low-income households. A document pertaining to Section 8 benefits, captioned "Housing Assistance Payments Contract (HAP Contract)," which is executed (not merely witnessed) by a representative of a city public housing agency and the rent-subsidized tenant's landlord, was entered into evidence at trial (*see*

*(n. cont'd)*

subject to long waiting lists," by 2010 it had become "virtually unavailable, due to severe budget cutbacks."

Supreme Court also disagreed with plaintiffs' "collateral argument (raised in the context of consideration) that, absent a contractual relationship, the Advantage landlords would not have participated in the program," based on the history of landlord participation in the City's rental assistance programs. Finally, the judge remarked that plaintiffs' claims of entitlement to a second year of eligibility under the Advantage program and of due process violations "fail[ed]" in view of her finding that there were no contractual obligations. Supreme Court's decision was entered by order and judgment on October 6, 2011. Plaintiffs took an appeal.

On February 2, 2012, the Appellate Division granted the City's motion to dismiss plaintiffs' appeal of Supreme Court's interlocutory order entered on May 2, 2011 and to vacate the stay; and denied plaintiffs' motion seeking to consolidate the appeals of Supreme Court's two orders and continue the stay (92 AD3d 412 [1st Dept 2012]). The court held that the entry of final judgment dismissing the complaint terminated plaintiffs' right to appeal from the interlocutory order, and that the preliminary injunction "must be dissolved since the purpose of a preliminary injunction is to maintain the status quo while an action is pending" (*id.* at 413).

On February 16, 2012, a separate panel, with one Justice dissenting, denied plaintiffs' motion for a further stay pending determination of their appeal from the final judgment (2012 NY Slip Op 64817[U] [1st Dept 2012]). On March 20, 2012, the same panel, with the same Justice dissenting, affirmed Supreme Court's order and judgment dismissing the complaint (93 AD3d 510 [1st Dept 2012]). The Appellate Division concluded "that the trial court correctly found that the Advantage rent subsidy program for the homeless was simply a social services program, and that [the City] did not intend to be bound contractually" (*id.* at 511).

The court cited our decision in *Brown Bros.* as setting out the proper framework for resolving the factual question of contractual intent, whereas "plaintiffs and the dissent place[d] undue emphasis on the trappings of contract language such as 'guarantee' or 'will pay,' construing them as legal promises

---

*McNeill v New York City Hous. Auth.*, 719 F Supp 233, 238-240 [SD NY 1989] [discussing the Section 8 program]).

rather than mere assurances" (*id.*). The Appellate Division, like Supreme Court, found that the word "guarantee" was intended "to allay fears that rents would not be paid in the absence of public assistance, as had often happened under previous subsidy programs"; and that "the signing procedure . . . was meant to accomplish no more than ensure that participants were aware of the terms of the [Advantage] program" (*id.*). "Even if the tenant participants and the landlords intended to be contractually bound," the court continued,

> "there [was] no enforceable contract in either instance because [the City] profess[es] to have understood the documents differently with respect to their basic material nature [and thus] there was no meeting of the minds.

> "Ultimately, as [Supreme Court] properly found at the nonjury trial, all of the surrounding circumstances lead to the ineluctable conclusion that the Advantage program was a social service program no different from any other, and not a contractual obligation undertaken by government" (*id.* at 512 [citation omitted]).

Although the Appellate Division did not need to reach the issue of whether there was "consideration for plaintiffs' becoming participants in the Advantage program," the court nonetheless observed that "a promise to perform an existing obligation is not valid consideration"; and here, "[p]ursuant to 18 NYCRR 352.35, plaintiffs were obligated to cooperate and accept the housing offered by the Advantage program" (*id.*). As a result, plaintiffs' "claim of providing consideration by suffering the detriment of leaving shelters and of leasing apartments that cost more than they could afford" was without merit (*id.*).

The dissenting Justice concluded that the City implemented the Advantage program through enforceable contracts by "agree[ing] to pay plaintiffs' rent in return for [their] leaving the shelter system [and agreeing] to pay rent so the landlords would provide housing for the . . . program"; and that "[t]hese bargained for exchanges support[ed] the existence of a contract, primarily between the participants and the City, but also between the landlords and the City" (*id.* at 513). She disagreed with Supreme Court's finding that mutual assent and consideration were lacking.

Addressing plaintiffs first, the dissenting Justice stated that, in her view, "there [was] a contract between the City and the

Advantage participants by virtue of the Certification Letter, the Participant Statements and the riders to the leases through which the City agreed to pay plaintiffs' rent for two years" (*id.* at 515). She construed the certification letter as an offer, which Advantage participants accepted by signing the participant statement and lease rider; she found it "clear [that] plaintiffs provided consideration to support the contract" by moving out of shelters and saving the City money which would otherwise have been spent on the shelter system (*id.* at 516).

Additionally, the dissenting Justice concluded that the City had contracted with landlords. Based on her review of the program documents, she opined that "[a] clearer indication of assent to guarantee rent payment would be hard to imagine" as a consequence of the City's use of the word "guarantee" and such phrases as "will pay" and "shall pay" in program documents, which thereby "demonstrate[d] an intent to bind oneself contractually" (*id.* at 517-518). In her view, "[t]he trial court was also incorrect in finding that the landlords did not manifest assent" because the commitments they made in the lease riders in exchange for guaranteed rental payments evinced an intent to be contractually bound (*id.* at 518-519).

On March 29, 2012, plaintiffs sought, by order to show cause, permission to appeal, an expedited appeal with a time preference and interim relief; on March 30, 2012, a Judge of this Court signed the order to the extent of bringing on the motion for permission and preference. On May 8, 2012, we granted plaintiffs leave to appeal and denied their request for interim relief (19 NY3d 849 [2012]). We now affirm.

## II.

*Brown Bros.* presents the template for deciding a case, such as this one, where the issue is "whether the course of conduct and communications between [the parties have] created a legally enforceable agreement" (*Brown Bros.*, 41 NY2d at 398). There, in January 1967, the owner and builder of a shopping plaza entered into a written contract with a general contractor to construct a section of the plaza. The general contractor, in turn, subcontracted with Brown for the electrical work. Starting as early as March, the general contractor, although more than current in the receipt of moneys from the owner/builder, was running behind in its payments to Brown. As a result, Brown threatened in writing to claim a breach of contract unless the payments were brought up to date. Then in July, the general contractor abandoned the job.

Between March and July, Brown and the owner/builder had discussed ways and means to secure payment for Brown. And with the owner/builder's knowledge, consent and cooperation, Brown continued to perform electrical work on the project after the general contractor departed. Brown finished this work by the end of August, and sent the owner/builder an invoice for the amount still due. The owner/builder wrote back in September that it would send its check for "payment of the balance" upon receipt of underwriters' inspection certificates from Brown. When Brown sent the certificates, though, the owner/builder did not make any payment, prompting Brown to sue. In the ensuing litigation, the owner/builder argued that it had not entered into a contract directly with Brown, and that Brown had done no more, in completing the electrical work, than fulfill its obligation to the general contractor.

The trial court, sitting without a jury, handed down a decision in favor of Brown. The Appellate Division affirmed, finding that the record developed at trial established the existence of a contract between Brown and the owner/builder and that, in accordance with that contract, the latter was obligated to pay the former the balance due for electrical work performed up to the time of completion. We affirmed, stating that "[o]ur own examination of the proof reveals that the course of conduct between [the owner/builder] and Brown, including their writings, especially taken against the continuum of events from March through September, was sufficient to spell out a binding contract between Brown and [the owner/builder] independent from the one that had pre-existed between Brown and [the general contractor]" (41 NY2d at 399). We then set out the principles governing our analysis leading to this result.

First, we explained, "the existence of a binding contract [was] not dependent on the subjective intent of either" Brown or the owner/builder because

"[i]n determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look, rather, to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds. In doing so, disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the

objectives they were striving to attain" (*id.* at 399-400 [citations omitted]).

We added that the "aim" of this exercise was "a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations" (*id.* at 400 [internal quotation marks omitted]).

Next, we pointed out that "while it is the responsibility of the court to interpret written instruments, *where a finding of whether an intent to contract is dependent as well on other evidence from which differing inferences may be drawn, a question of fact arises*" (*id.* [internal quotation marks and citations omitted] [emphasis added]). Because each of the lower courts found as a fact that Brown and the owner/builder "intended to contract," our review was confined to an "examin[ation of] the nature of the proof to determine whether [the lower courts] were warranted" in finding this fact (*id.*).

We then detailed the course of conduct and communications between Brown and the owner/builder between March and September 1967, as proved at trial, concluding that "[t]his step-by-step continuum of events and permissible inferences, viewed in totality, brought the determination of whether there was an intent to contract within the realm of fact finding"; that the Appellate Division had found that there was a contract between Brown and the owner/builder under "the terms of which Brown would be bound to continue to perform the electrical installations which remained undone and [the owner/builder] would be bound to pay Brown all sums still unpaid when the work was completed"; and that we "[could not] say that there was insufficient evidence to support that finding" (*id.* at 401-402).

On this appeal, plaintiffs argue that the lower courts misapplied the *Brown Bros.* standard for mutual assent and abused their discretion in reaching a conclusion that was not supported by the record, which they claim establishes enforceable contracts between the City and the landlords, to which they are third-party beneficiaries. In particular, plaintiffs portray the lower courts as improperly focused on the City's subjective intent. As proof of this proposition, they lean heavily on two isolated phrases in the Appellate Division's decision: "that [the City] did not intend to be bound contractually" (93 AD3d at 511), and "understood the [program] documents differently with respect to their basic material nature" (*id.* at 512).

But we made clear in *Brown Bros.* that the key question of fact for the factfinder to decide in a case such as this is whether

the parties to the putative contract exhibited "an intent to contract." This is no different from asking whether they "intend[ed] to be bound contractually," as the Appellate Division put it, or—in expressions of Supreme Court also criticized by plaintiffs—whether the City "manifest[ed] an intent to be contractually bound to provide the benefits associated with the Advantage program" or "manifest[ed] an intent to create a contractual obligation." Further, the other supposedly improper phrase in the Appellate Division's decision, when read in context, simply makes the unexceptional point that mutuality of intent is necessary for a valid contract.[8]

Contrary to plaintiffs' assertions, Supreme Court painstakingly applied the *Brown Bros.* standard, as our detailed discussion of the judge's opinion demonstrates: she "look[ed] . . . to the objective manifestations of the intent of the parties"—in particular, the City—by reviewing "expressed words and deeds"; and "[i]n doing so," the judge did not place "disproportionate emphasis . . . on any single act, phrase or other expression, but, instead, [considered] the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain" (*Brown Bros.*, 41 NY2d at 399-400).

For example, plaintiffs fault Supreme Court for affording insufficient weight to the word "guarantee" in the certification letter sent to a prospective Advantage tenant, which they construe as an offer to a landlord to contract. But consistent with *Brown Bros.*, Supreme Court did not look at the word "guarantee" or the certification letter in which it appeared in isolation. Rather, the judge looked at the word as it appeared in the document's subject line—i.e., followed by the parenthetical "(*Guaranteed Rent Not Tied to [PA]*)" (emphasis added)—and in light of "the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." In this regard, several witnesses, representing both landlords and the City, testified that the defining characteristic of the Advantage

---

8. The complete sentence reads as follows:
   "Even if the tenant participants and the landlords intended to be contractually bound, there is no enforceable contract in either instance because [the City] profess[es] to have understood the documents differently with respect to their basic nature, i.e., that the City was undertaking a governmental social services obligation that was within its discretion to terminate rather than a contractual obligation; there was no meeting of the minds" (93 AD3d at 512).

program was that subsidy payments would not be tied to a tenant's PA eligibility; there was testimony that the program was designed in this way so as to avoid some of the problems that had hampered the effectiveness of HSP, a predecessor program with the same goal of moving homeless families and single adults from temporary shelter to permanent housing. In light of the totality of the evidence, Supreme Court found, as a matter of fact, that the City had not, when it used the word "guarantee" in the certification letter or promotional materials, intended to make a contractual guarantee of payment to landlords under the Advantage program (*see supra* at 566). The Appellate Division agreed.

As *Brown Bros.* also teaches, our review in this case, where Supreme Court's factual findings have been affirmed by the Appellate Division, is limited to whether there is sufficient evidence in the record to support Supreme Court's determinations; in particular, the finding that the City did not intend to enter into enforceable contracts with plaintiffs or their landlords under the Advantage program. While plaintiffs urge otherwise, there is more than sufficient evidence in the record to support Supreme Court's findings of fact.

The dissenters warn that "[a]fter today, even the clearest of contract terms on which public and private entities routinely rely to efficiently coordinate their transactions apparently will grant no assurance that the law will recognize an agreement and provide a remedy for its breach" (dissenting op at 582). We suggest, however, that the "clearest of contract terms" are generally to be found in a written agreement executed by contracting parties, which "when unambiguous on its face must be enforced according to the plain meaning" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]). Here, no document whatsoever was executed by the City and any landlord respecting the Advantage program. By contrast, as part of a Section 8 housing program, a city agency and a landlord execute a document specifically captioned "Housing Assistance Payments Contract (HAP Contract)," by which the City is, in fact, contractually obligated to pay rent subsidies to the landlord on behalf of the specific tenant household identified in the agreement (*see supra* at 568 n 7).

Additionally, the dissenters lament the "human consequences" of our decision (dissenting op at 582). But we are not well-positioned to predict what "human consequences" may result from termination of the Advantage program. The City

represented at oral argument that it is committed to helping tenants deal with the loss of the Advantage subsidy and that, to date, very few have returned to shelters. For their part, the dissenters simply disregard that knowledgeable city officials—charged with equitable distribution of services for *all* vulnerable New York City residents, not just these plaintiffs— made a considered judgment in 2011 that the roughly $160 million required to continue the Advantage program was better spent in other ways.[9]

This judgment was obviously reluctantly reached by city officials, who developed and championed the Advantage program in the first place, but the loss of two thirds of the funding forced a policy choice. The courts are not empowered to second-guess the City by conjuring up a "contract" from bits and pieces of documents meant to explain and condition participation in what was a voluntary government program. Indeed, doing so can only discourage governmental bodies from enacting voluntary programs to help the needy; they will fear being compelled by judges to continue such programs even if sources of funding are reduced or withdrawn. However much our sympathies may lie with plaintiffs, the fact remains that the courts below found, with record support, that the City made no contractual commitment to continue the Advantage program through expiration of plaintiffs' leases.

Accordingly, the order of the Appellate Division should be affirmed, without costs.

CIPARICK, J. (dissenting). In the City of New York, the number of people currently in need of shelter, that most basic of human necessities, is staggering: on a recent night in June, 42,007 individuals were in the city shelter system; 17,301 of them were

---

**9.** In a letter submitted to us in connection with plaintiffs' motion for leave to appeal, Corporation Counsel stated that

"[w]hen plaintiffs appealed the order denying their motion for a preliminary injunction, a short-lived trial-court stay and ensuing Appellate Division preliminary injunction required the City to continue making rent payments through January 2012. As a result, the City was forced to expend approximately $115 million of the $160 million it expected not to have to use to continue Advantage subsidies. The City's savings diminish dramatically over time since tenant leases expire every month, and all will be expired by March 2013."

According to plaintiffs' counsel, roughly 8,000 households remained in the Advantage program as of February 1, 2012.

children (*see* http://www.nyc.gov/html/dhs/downloads/pdf/ dailyreport.pdf [accessed June 14, 2012]). In 2007, the City, through its agencies and codefendants the Department of Homeless Services (DHS) and Human Resources Administration (HRA), created Advantage New York, a program designed to move homeless individuals and families out of shelters and into permanent housing by providing rental subsidies to enable them to lease apartments from private landlords. Because I believe that the City, as a matter of law, formed a contract with participating landlords to continue paying rental subsidies on behalf of current Advantage tenants like plaintiffs—an agreement that plaintiffs rightly seek to enforce as third-party beneficiaries—I respectfully dissent.

It is axiomatic that "[t]o create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (*Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.*, 93 NY2d 584, 589 [1999]). "Generally, [we] look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract" (*id.*).

"In determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look . . . to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds" (*Brown Bros. Elec. Contrs. v Beam Constr. Corp.*, 41 NY2d 397, 399 [1977]; *see also Mencher v Weiss*, 306 NY 1, 7 [1953] ["It is well-established contract law that in determining whether the parties possessed the necessary intention to contract, an objective test is generally to be applied"] [internal quotation marks, brackets and citation omitted]). One party's subjective or actual intent not to be legally bound is of no moment (*see* Lord, Williston on Contracts § 4:1 ["(I)t was long ago settled that secret, subjective intent is immaterial"]), unless "*the other knows or has reason to know of that intention*" (Restatement [Second] of Contracts § 21, Comment *a*, Illustration 2 [emphasis added]). Thus, as Judge Learned Hand stated, even "[i]f . . . it were proved by twenty bishops that either party, when he used the words, intended something else than the *usual meaning which the law imposes upon them,* he would still be held, unless there were some mutual mistake, or something else of the sort" (*Hotchkiss v National City Bank of N.Y.*, 200 F 287, 293 [SD NY 1911] [emphasis added]).

It follows that, here, while "disproportionate emphasis is not to be put on any single act, phrase or other expression" (*Brown Bros.*, 41 NY2d at 399-400), we must ascertain the City's manifested intent, in the first instance, "from the language [it] used" (*Lally v Cronen*, 247 NY 58, 63 [1928]) in the documents that implemented the Advantage program. "[T]he aim is a practical interpretation of the expressions of the parties to the end that there be a realization of their reasonable expectations" (*Brown Bros.*, 41 NY2d at 400 [internal quotation marks and brackets omitted]). To that end, we apply the well-settled principle that "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part . . . of no effect" (Restatement [Second] of Contracts § 203 [a]).

Relying on *Brown Bros.* and proceeding on the premise that the "issue is whether the course of conduct and communications between the parties have created a legally enforceable agreement" (majority op at 571 [internal quotation marks and brackets omitted]), the majority erroneously determines that Supreme Court's affirmed finding (that the City did not manifest its assent to contract with Advantage landlords) is one of fact, such that our review is limited to whether record evidence supports that determination (*see* majority op at 573, 573-574). But "*where a question of intention is determinable by written agreements, the question is one of law*, appropriately decided by an appellate court" (*Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.*, 32 NY2d 285, 291 [1973] [emphasis added]). Here, there is no need to look to the parties' course of conduct or any "continuum of events and permissible inferences" (*Brown Bros.*, 41 NY2d at 401) because we can determine the question of the City's intent—and, more importantly, what a reasonable person in the position of the landlords would reasonably have understood the City's intent to be—from the language of the Advantage program documents alone.[1] Thus, our inquiry is one of law, guided by the familiar principles discussed above.

---

1. In *Brown*, by contrast, there was no writing or set of writings embodying a complete agreement; rather, an invoice sent by Brown, a subcontractor, to the defendant owner and the owner's response that it would "pay . . . the balance" evinced that the parties may have come to a prior, unmemorialized agreement (*see* 41 NY2d at 399). Only upon thoroughly examining the surrounding circumstances and the parties' communications, however, was it apparent that the owner and subcontractor, out of mutual self-interest, had arrived at an agreement for the latter to complete the electrical work it was

*(n. cont'd)*

Taken together, the Advantage program documents unambiguously memorialize a bargained-for exchange between the City and the Advantage landlords to which the parties mutually assented. In the Certification Letter, which was drafted on DHS and HRA letterhead,[2] signed by a city representative and shown to the landlords to induce them into renting apartments to plaintiffs in lieu of other potential tenants, the City *"guarantee[d] that the subsidy portion of the rent will be paid* directly to [the] landlord for one year"[3] (emphasis added). Having accepted the City's offer in accordance with its terms,[4] a landlord signed a Landlord Statement of Understanding, printed on DHS letterhead, that indicated his or her understanding that "the [City] *will pay* directly to me, the Landlord, monthly rent . . . for a period of one year" and that an Advantage tenant "is automatically entitled to a self-executing renewal of the Lease for a second year" (emphasis added). In exchange, the landlord made significant "commitments," including to refrain from charging an Advantage tenant any amount beyond the agreed upon rent, to offer the apartment at the same level of rent for a second year, to supply heat and hot water and to allow the City to place another Advantage tenant in the apartment in the event the original tenant moved or was evicted.[5] Lastly, an Advantage tenant and participating landlord signed a lease rider, providing that the tenant "agree[d] [to] authorize[ ]" the City to pay "rental assistance directly to the Landlord" and that the City

hired to perform by the general contractor, despite the general's default (*see id.* at 400-401).

2. Under New York law, official letterhead of a city agency such as DHS and HRA constitutes the signature of that agency, and, by extension, the City (*see* General Construction Law § 46). However, the absence of a signature would still not be fatal to an agreement possessing the requisite elements of a contract in light of the "common-law rule that written documents can be enforced even if they are not signed" (*Flores v Lower E. Side Serv. Ctr., Inc.*, 4 NY3d 363, 369 [2005]).

3. The Certification Letter also indicated the total rent allowable under the program, the amount of rent the City would subsidize, the amount of rent for which the tenant was responsible, the initial prerequisites for the program and when the certification would expire.

4. The Certification Letter contained a section entitled "Information for Brokers and/or Landlords," instructing landlords to contact DHS at a provided phone number and stipulating that "[a]ll apartments must pass a Housing Quality Standard inspection before being leased."

5. The Participant Statement, also printed on DHS letterhead and signed by the tenant and a city representative, provided that "[u]nder the Advantage Program, [the City] will pay a portion of [the tenant's] monthly rent . . . directly to [his or her] Landlord."

"shall pay" those subsidies. None of the statements contained in those documents were conditioned on the City's receipt of state or federal aid, or on the City's ability to fund the subsidies.

Terms and phrases such as "guarantee," "shall" and "will pay" are not merely "trappings of contract language" or "mere assurances," as the Appellate Division majority declared (*Zheng v City of New York*, 93 AD3d 510, 511 [1st Dept 2012]). Rather, "the usual meaning which the law [and common usage] impose[ ] upon" these words (*Hotchkiss*, 200 F at 293) is one of binding obligation, not election (*see* Black's Law Dictionary 772 [9th ed 2009] [defining "guarantee" as "(t)he assurance that a contract or legal act will be duly carried out"]; *see also Matter of Syquia v Board of Educ. of Harpursville Cent. School Dist.*, 80 NY2d 531, 536 [1992]; *Matter of Jewett v Luau-Nyack Corp.*, 31 NY2d 298, 304 [1972] [construing "shall" as mandatory, rather than permissive]). Thus, a reasonable person in the position of the Advantage landlords would justifiably understand that the City was, by virtue of that mandatory language, promising to pay rental subsidies on plaintiffs' behalf for the term of plaintiffs' leases. Indeed, it would have been patently *unreasonable* for landlords to read such language in the anomalous manner of the courts below, which, in essence, found that "guaranteed" meant "not guaranteed," "shall" meant "may," and "will pay" meant "may pay." That strained interpretation renders the City's own choice of words of no effect, an outcome the law instructs us to avoid (*see Cobble Hill Nursing Home v Henry & Warren Corp.*, 74 NY2d 475, 483 [1989] ["the conclusion that a party's promise should be ignored as meaningless is at best a last resort"] [internal quotation marks omitted]; *see also* Restatement [Second] of Contracts § 203 [a]).

Both Supreme Court and the Appellate Division majority determined that, in using the mandatory language discussed above, the City meant to distinguish the Advantage program from its predecessor program, Housing Stability Plus (HSP), which tied the receipt of rental subsidies to the tenant's public assistance (PA) status and, to the ire of landlords, resulted in frequent subsidy disruptions. The courts found that in "guarantee[ing]" subsidy payments regardless of changes in a tenant's PA status, the City intended not to bind itself contractually, but to allay landlords' concerns that rent would go unpaid (*see Zheng*, 93 AD3d at 511). But accepting this manufactured definition of "guarantee" is problematic for two reasons. First, it mistakenly relies almost entirely on the City's subjective

understanding of the language it used, as opposed to what a reasonable person in the landlords' position would understand the language to have meant. In neither decision below was that vital analysis undertaken with regard to any of the program documents.[6] Secondly, even if one in that position would have understood the City's mandatory language as conveying a distinction from HSP—due to the parenthetical appearing in the Certification Letter's subject line, "(Guaranteed Rent Not Tied to [PA])"—it would only serve to enhance one's belief that the City's commitment to consistent subsidy payments was binding. After all, that changes in PA status would not disrupt payment of a rental subsidy would be a promise of scant value if, in actuality, the City was under no continuing obligation to pay the subsidy at all and could terminate it at will.

The majority's statement that "no document whatsoever was executed by the City and any landlord respecting the Advantage program" (majority op at 575) effectively cuts the Landlord Statement of Understanding—drafted on city letterhead, signed by landlords and embodying the parties' mutual promises regarding the Advantage program—right out of the record. That this and other Advantage program documents were not "specifically captioned" as a contract, like documents used pursuant to the Section 8 housing assistance program (*see id.*), is not determinative of whether they created a contract as a matter of law (*see generally Winston v Mediafare Entertainment Corp.*, 777 F2d 78, 80 [2d Cir 1986]; *see also* 1 Williston on Contracts § 1:3 ["A binding agreement sufficient to establish a contract requires no precise formality"]).

Although I strongly maintain that the question before us is one of law, even if it were, as the majority holds, one of fact (*see* majority op at 573), the record evidence purportedly supporting the conclusion that the City did not manifest its assent to a contract with the landlords is inapposite. The City's unwillingness, for example, to become a party to the underlying leases between the Advantage tenants and landlords has nothing to do

---

**6.** The majority incorrectly states that the analysis we find lacking in the decisions below concerned the landlords' intent (majority op at 567 n 5). Rather, as we have explained, what is at issue is the City's objectively manifested intent, which should be gleaned from looking to what a reasonable person in the position of the landlords, as promisees, would have understood from the City's writings (*see* 1 Lord, Williston on Contracts § 1:2 [4th ed] ["(W)hether a manifestation of intention by the promisor will have operative effect as a promise depends upon how the promisee understands the manifestation. That manifestation, however, is judged by an objective standard"]).

with whether the City entered into a separate and distinct agreement with Advantage landlords to subsidize the rent obligations created by the leases. Quite simply, the City's emphasis on its status as a nonparty to any Advantage lease is entirely misplaced; that one is not bound by contract A has no bearing on whether one assented to be bound by contract B.

Much has been made of the fact that "the Advantage rent subsidy program for the homeless was simply a social services program" (*Zheng*, 93 AD3d at 511), as though the term "social services program" were anathema to the law of contracts; it is not. Nor is it a shield that, when invoked, permits the City to renege on the very promises it used to induce private parties— here, the landlords, who received no program benefits—to enter into separate agreements, causing them to forgo profitable alternatives for the use of their property. The result of the majority's decision is cause for concern. After today, even the clearest of contract terms on which public and private entities routinely rely to efficiently coordinate their transactions apparently will grant no assurance that the law will recognize an agreement and provide a remedy for its breach.

The human consequences of today's decision are even more compelling. As Justice Moskowitz opined in her dissent:

> "Now, because the City breached its contractual obligations, the landlords face the expense of eviction proceedings in court and nonreceipt of rent. Plaintiffs are now potentially liable for the balance of leases they cannot afford. They are also in an untenable situation whereby they face eviction and homelessness. Many Advantage participants are victims of domestic violence. They will not be eligible to return to the relative safety of the domestic violence shelter system unless they suffer new incidents of domestic violence"[7] (*id.* at 519).

Accordingly, I would reverse the order of the Appellate Division and grant the relief sought, a declaration that the City entered into binding contracts with its Advantage landlords and that plaintiffs are entitled to specific performance of those contracts.

---

**7.** We now know from the City's post-argument submission that, in fact, 252 families within the class are victims of domestic violence (*see* letter of defendant, June 4, 2012 ¶ 2).

Judges GRAFFEO, SMITH and PIGOTT concur with Judge READ; Judge CIPARICK dissents and votes to reverse in a separate opinion in which Chief Judge LIPPMAN and Judge JONES concur.

Order affirmed, without costs.