[8 NYS3d 1]

ANDREW KOLCHINS, Respondent, v EVOLUTION MARKETS, INC., Appellant.

First Department, April 2, 2015

## APPEARANCES OF COUNSEL

*Wechsler & Cohen, LLP,* New York City (*David B. Wechsler* and *Todd Gutfleisch* of counsel), for appellant.

*Debevoise & Plimpton LLP,* New York City (*Jyotin Hamid* and *Olga Kaplan* of counsel), for respondent.

## OPINION OF THE COURT

RENWICK, J.

 This breach of contract action stems from plaintiff Andrew Kolchins's employment with defendant Evolutions Markets, Inc. The most recent employment agreement commenced on September 1, 2009 and ended on August 31, 2012. Before its expiration, the parties engaged in correspondence with regard to an extension of the agreement. The question for our determination is whether the parties' emails and other correspondence can be viewed as constituting a binding offer and acceptance of an extension of the 2009 employment agreement,

such that in the absence of a formal contract they created a legally enforceable contract. Because we find that the documentary evidence does not utterly refute plaintiff's factual allegations that the parties reached an agreement on the material terms of a contract renewal, we conclude that Supreme Court properly denied defendant's motion, pursuant to CPLR 3211 (a) (1), to dismiss the first cause of action for breach of contract.

## Factual Background

The international finance firm of Evolutions Markets, Inc. structures transactions and provides brokerage and advisory services in the global environmental and energy commodities marketplace. Plaintiff joined defendant in 2005. In 2006, the parties entered into a three-year employment agreement dated September 1, 2006. Over the course of his tenure with defendant, plaintiff came to manage defendant's renewable energy market group.

On August 31, 2009, the parties executed the 2009 employment agreement covering the three-year period ending on August 31, 2012. The 2009 agreement provided for plaintiff to receive a base salary of $200,000 per year, and for plaintiff to receive a number of bonuses. Among these was a "Sign On Bonus" of $750,000, payable in three installments, with $300,000 due within 10 days of the employment agreement start date and equal installments of $225,000 due on the first and second anniversaries of the start date. The 2009 agreement also provided for plaintiff to participate in a production bonus of at least 55% of net earnings received by plaintiff's group, paid on a trimester basis, payable "within two months of the close of a given trimester."

The third significant provision in the 2009 employment agreement was the special noncompete payment. This payment provision was triggered if plaintiff were terminated by defendant *"without cause"* or quit his employment for "Good Reason" at any time prior to termination of the three-year period of employment. In such event, plaintiff was entitled to receive, along with his base salary and bonuses, a special noncompete payment in exchange for agreeing not to work "for a Competitor" for a period of six months after his termination or resignation. The special noncompete payment was to be made "on the firm-wide bonus payment dates following receipt of funds by [defendant]," with any such payments "calculated consistent with the calculation of [plaintiff's] bonus compensation during

the last trimester [he was] an employee of [defendant]." The "Special Non-Compete Payment" was defined as "bonus compensation in respect of transactions: (i) that [plaintiff] brokered during the period of [his] employment and (ii) for which any contingency associated with [defendant's] right to receive payment is satisfied during the Non-Compete Period."

The fourth significant provision of the 2009 employment agreement was the guarantee payment. As the label indicates, this provision guaranteed that plaintiff would receive a minimum combined base salary and bonus for each year of the contract of no less than $750,000. If such combined bonus and salary did not reach the $750,000 threshold for a specific year, the difference would constitute a "Make Whole Payment" due to plaintiff at the end of each year. The guarantee calculation, however, did not include the "Sign On Bonus." In addition, the provision contained a "For the avoidance of doubt" clause, which provided that, unlike the other bonuses, the bonus that plaintiff would earn during the second trimester of the 2009 employment agreement would not count toward the computation of the guarantee payment. On the other hand, any amounts payable to plaintiff under the special noncompete payment would count toward the computation of the guarantee compensation for the last year of the contract ending on August 31, 2012.

Finally, the 2009 agreement stated that, "[e]xcept as provided above with respect to the Sign On Bonus and Special Non-Compete Payment, in order to be eligible to receive any Production Bonus . . . or Guaranteed Compensation, [plaintiff] must be actively employed by [defendant] at the time of [its] firm-wide bonus payment dates." Likewise, the agreement stated, plaintiff "will not be eligible to receive any such bonus or Guaranteed Compensation if [he had] already given notice of [his] intention to resign."

On June 15, 2012, towards the end of the 2009 agreement, defendant's CEO, Andrew Ertel, sent plaintiff an email captioned "In writing," which stated:

> "The terms of our offer are the same terms of your existing contract (other than a clarification around the issue of departed members of the team), and include:
>
> "3 year term
>
> "$200,000 base salary

"$750,000 sign on bonus ($300,000 payable upfront, $225,000 payable on 1st and 2nd anniversaries)

"$750,000 per year minimum cash compensation

"production bonus pool of 55% of net earnings of [renewable energy] desk.

"Any further questions, let me know but u do have your existing contract."

On July 16, 2002, plaintiff replied to Ertel's June 15 email, stating, in full, "I accept, pl[ease] send contract." Ertel immediately replied, stating, in full, "Mazel. Looking forward to another great run."

On July 20, 2012, defendant's general counsel Benjamin Zeliger emailed plaintiff a "clean and marked draft of [his] new employment agreement." Zeliger stated that "[m]ost of the changes are simply updates to dates and your role as [director] of the [renewable energy] business." Zeliger noted two "substantive changes," however. The first of these proposed changes was that plaintiff repay any year's installment of the sign on bonus if he quit "without Good Reason or [were] terminated for Cause" in that year. Zeliger asserted that this "clawback" provision was now standard company policy in order to "protect the company from paying a sign on bonus and then having the employee quit after receiving it." The second change related to "clarifying language regarding the retention of desk employee bonuses if the employees are no longer with [defendant]."

A few minutes later, plaintiff responded, "I will review and provide my initial feedback before sending to counsel. I will just want reciprocal language pertaining to clawback prob [sic]. If you fire me [without] cause I get the full sign-on bonus." Zeliger replied, "[T]hat protection is already in there for you."

On July 24, 2012, Zeliger emailed plaintiff a "revised" "draft." Zeliger stated that he had "agreed to make several changes that [plaintiff] requested," including "[s]pecifying that [plaintiff] shall be a member of the management committee," reducing the number of people to whom plaintiff had to report on certain issues, and "[s]pecifying" plaintiff's power to effect a "management override" relating to bonuses for departed employees. Zeliger declined to make certain changes, explaining:

"We did not change the clawback to reflect a pro rata repayment. The repayment amount remains the amount of the last sign on bonus paid.

"We did not reinsert the 'For the avoidance of doubt . . .' sentence in the guarantee paragraph. That provision was unique to 2009 when your current contract was signed, and was meant to not include the [second trimester] bonus from 2009 as part of your guarantee for the first year of your current contract because your bonus structure had changed. Your new contract, however, roles [sic] the guarantee from your current contract, and the guarantee for the next three years should continue to be calculated in the same way as the guarantee from the previous 2 years—i.e., calculated by measuring total cash compensation received during each one year period beginning on Sept 1st."

"We did not change the terms of the Special Non-Compete Payment, which remain the same as your current contract."

Zeliger closed, "I am happy to discuss further, and I understand that you are going to show the agreement to your attorney for review." Within a few minutes, plaintiff responded:

"We can discuss tomorrow. But not including the avoidance of doubt sentence makes no sense. Why would any money that I earned for the company in [the second trimester] and paid in a new contract go against my minimum[?] It defie[s] logic and common sense. This provision will actually benefit [defendant] as say in any one year I may have a large bonus due to me [o]n Oct 31 that could be used against my minimum, rather than be forced to pay me."

Zeliger replied, "Let's discuss tomorrow. As I understand it, the calculation is meant to be total cash paid to you between Sept 1st through August 31st." Plaintiff responded, again a short time later,

"The statement that that was meant for 2009 only is BS [sic] and is not what the intended [language] was created for. It was created for just this. No way should this revenue go against my minimum in a new contract year. It is a bad faith statement and I don't understand [defendant's] logic."

Plaintiff then added, "This contract was presented to me as a mirror image of my last one. This doesn't reflect that."

On August 3, 2012, Zeliger emailed plaintiff:

"We have discussed your request regarding the calculation of your guarantee and, in an effort to finalize your contract, we've agreed to make that change. Please note that we're agreeing to this change subject to you not having any additional substantive changes to your contract, as we hope the agreement is now substantially final. Attached is a marked draft of your contract compared against the last draft I sent. You'll see that we extended your term by two months and now have the guarantee calculated from each Nov 1 - Oct 31 period during the term."

On August 13, 2012, plaintiff responded with "limited comments" from his "attorney." Zeliger replied two days later, stating that defendant had "accepted some of [plaintiff's] lawyer's changes and tweaked some others," and "hope[d] to be able to sign this soon."

In an email to Zeliger dated August 15, 2012, plaintiff suggested that they "discuss in person," stating:

"It seems to me to be over reaching to not allow me to communicate with clients or solicit [defendant's] employees for a period of time after my non compete. Understanding we are negotiating a worst case scenario, how can you expect to prevent me from working or doing a job WITHOUT paying me, If you want to prevent me from doing these things th[e]n pay me.

"In regards to the special non compete, why would any monies paid to me after the contract period go against a previous years guaranteed comp [sic]? [Doesn't] that go against common sense? If you want that term, th[e]n protect me with the special non compete payment if and when my contract expires and you hold me out. These are all reasonable requests.

"You have to understand that my base salary is a mere portion of my compensation and if you hold me out of the market (in a worst case scenario) than [sic] you are really not paying me to sit out as my comp [sic] is mainly determined thr[ough] my bonus. In otherwords, you already have a VERY

RESTRICTIVE non compete, which [I] am fine with . . . but you have to pay me to enforce it."

In an email dated August 17, 2012, Zeliger offered to set up a call to discuss the contract, stating:

"At this time, we are not willing to make the additional requested changes to your agreement other than the changes that we accepted in the last draft. Also, we have two changes that we want to make: (1) extending the employee non-solicit from 9 months to 18 months following the non-compete period; and (2) revising the production bonus language to clarify that while your payout from the bonus pool is 55% of your net income, the payout for others on the desk is less depending on seniority."

Within minutes, plaintiff responded, stating, "We are headed the wrong way. I cannot accept non compete language that prevents me from doing my [job] or a job without getting paid." In an email to Zeliger dated August 23, 2012, plaintiff followed up, stating, "I am not willing to consider your two proposed changes. Let me know what the next steps are if any." Zeliger responded, "[J]ust so I understand, do you otherwise accept the last draft of your agreement that we sent to you?" Plaintiff replied:

"For the most part my comments are not meant to be commercial but to tinker with language that was written 3 yrs ago to reflect today's scenario.

"[Defendant's] approach was to counter my comments with terms that did not do anything to improve the contract language[;] rather it was to be confrontational.

"I just don't understand why common sense refuses to be used on some of this language.

"I haven't had a chance to review this language for over a week and don't think your 2 unreasonable terms were going to have me change my opinion on some of th[is] language.

"Is that how you were negotiating[?] Actually I don't want to negotiate. I think we agreed to terms. It is clarifying some old language."

While on vacation, plaintiff informed defendant that he wished to continue discussing the contractual "documentation

issues" when he returned to the office on Tuesday, September 4, 2012. This did not happen.

Instead, by letter dated September 1, 2012, defendant advised plaintiff that his employment had "ceased":

> "On June 22, 2012, you notified us that you do not wish to extend (*i.e.*, renew) your Employment Agreement with [defendant]. Since then, despite our efforts, you have not entered into a new written employment agreement with us. That is unfortunate, but your decision. However, as a result of your decisions, the Ending Date under your Employment Agreement was yesterday, August 31, 2012. As a result, your employment with [defendant] has ceased effective today. That said, we remind you of, and expect you to abide by, your ongoing obligations under your Employment Agreement, including without limitation those set forth in Section 6 [restrictive covenants], which [defendant] will enforce. . . .

> "While we believe the cessation of your employment is not a termination by [defendant], and instead a non-extension of your Employment Agreement at your choice, without prejudice to [defendant's] positions, in an effort to avoid any dispute, and fully reserving all of its rights and claims, [defendant] will nonetheless pay you: (i) thirty days base salary and benefits in lieu of notice; and (ii) your base salary during the Non-Compete Period so long as you execute and return to [defendant] the enclosed General Release (the form of which was annexed to your Employment Agreement as Exhibit B . . . )."

Following the notification from defendant that his employment had "ceased," plaintiff commenced this action in October 2012. The first cause of action alleges breach of contract and seeks damages for "benefits to which [plaintiff] is entitled under the 2009 Employment Agreement as extended by the Extension Agreement." The second cause of action alleges unjust enrichment, by virtue of defendant's "retaining" his production

bonus for the second trimester of 2012, as well as further monies allegedly owed him as a special noncompete payment.[1]

In November 2012, defendant moved pursuant to CPLR 3211 (a) (1) to dismiss the first and second causes of action of the complaint for failure to state a claim based on documentary evidence. In support of its motion, defendant submitted, among other things, copies of the correspondence between the parties summarized above. As to plaintiff's claim that defendant had breached the 2009 agreement, defendant argued that, because his employment ended before the contractual due date of the production bonus and special noncompete payment, plaintiff had "forfeited his right to the monies." Defendant argued that plaintiff's second cause of action, for unjust enrichment, was "precluded by the existence of a written contract," namely, the 2009 agreement.

The motion court partially granted defendant's motion to dismiss to the extent of dismissing the second cause of action for unjust enrichment as duplicative of the breach of contract claim. The court, however, denied dismissal of the breach of contract claim on two grounds. First, the court found that the "emails submitted are not 'documentary evidence' under [CPLR 3211 (a) (1)]." (2013 NY Slip Op 31978[U], *6 [Sup Ct, NY County 2013].) Secondly, the court found that even if deemed documentary evidence, the emails do not "conclusively refute Plaintiff's contention that the parties had entered into a binding agreement as of July 16, 2012." (*Id.* at *7.)

### Discussion

On a motion to dismiss pursuant to CPLR 3211 (a) (1), a court is obliged "to accept the complaint's factual allegations as true, according to plaintiff the benefit of every possible favorable inference, and determining only whether the facts as alleged fit within any cognizable legal theory" (*Weil, Gotshal & Manges, LLP v Fashion Boutique of Short Hills, Inc.*, 10 AD3d 267, 270-271 [1st Dept 2004] [internal quotation marks omit-

---

1. Plaintiff also avers a third cause of action seeking a declaration that section 6.3 (b) of the 2009 agreement, which "purports to prohibit [plaintiff] from having any business dealings or communications with a client of [defendant] for a period of nine months following the termination of his employment," is "not enforceable to prohibit [plaintiff] from entering into a consulting arrangement with a client (not a competitor) that would not involve any activity competitive with the business of [defendant], any solicitation on behalf of a competitive business, or any use or disclosure of any confidential information of [defendant]."

ted]). Moreover, dismissal pursuant to CPLR 3211 (a) (1) is warranted only if the documentary evidence submitted "utterly refutes plaintiff's factual allegations" (*Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 326 [2002]; *see Greenapple v Capital One, N.A.*, 92 AD3d 548, 550 [1st Dept 2012]), and "conclusively establishes a defense to the asserted claims as a matter of law" (*Weil, Gotshal & Manges, LLP*, 10 AD3d at 270-271 [internal quotation marks omitted]). If the documentary proof disproves an essential allegation of the complaint, dismissal pursuant to CPLR 3211 (a) (1) is warranted even if the allegations, standing alone, could withstand a motion to dismiss for failure to state a cause of action (*see McGuire v Sterling Doubleday Enters., L.P.*, 19 AD3d 660, 661-662 [1st Dept 2005]).

In this case, defendant's defense to the breach of contract claim, premised upon documentary evidence, boils down to the contention that the exchange of emails and other correspondence described above establishes as a matter of law that the parties did not enter into an extension of the 2009 employment agreement. Since the employment agreement had not been renewed, defendant argues, it had no duty to pay a sign on bonus for any new contract. Likewise, it had no duty to pay any production bonus for the second trimester of 2012 (which ended on Aug. 31, 2012), since, under the 2009 agreement, plaintiff was only entitled to receive that bonus if he remained employed two months after it had accrued. Similarly, since plaintiff's contract had simply expired, and he had not been terminated, it had no duty to give plaintiff any special noncompete payment.

■ Preliminarily, we reject Supreme Court's conclusion that correspondence such as the emails here do not suffice as documentary evidence for purposes of CPLR 3211 (a) (1). This Court has consistently held otherwise. For example, in *Schutty v Speiser Krause P.C.* (86 AD3d 484, 484-485 [1st Dept 2011]), this Court found drafts of an agreement and correspondence sufficient for purposes of establishing a defense under the statute. Similarly, in *Langer v Dadabhoy* (44 AD3d 425, 426 [1st Dept 2007], *lv denied* 10 NY3d 712 [2008]), this Court found "documentary evidence in the form of e-mails" to be sufficient to carry the day for a defendant on a CPLR 3211 (a) (1) motion. Likewise, in *WFB Telecom. v NYNEX Corp.* (188 AD2d 257, 259 [1st Dept 1992], *lv denied* 81 NY2d 709 [1993]), this Court granted a CPLR 3211 (a) (1) motion on the basis of a letter

from the plaintiff's counsel that contradicted the complaint. Therefore, there is no blanket rule by which email is to be excluded from consideration as documentary evidence under the statute.

■ Nevertheless, we agree with Supreme Court that the disputed emails and other correspondence do not utterly refute plaintiff's allegations that the parties reached an agreement on the material terms of the contract renewal. "To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound (22 NY Jur 2d, Contracts § 9). That meeting of the minds must include agreement on all essential terms (*id.* § 31)" (*Kowalchuk v Stroup*, 61 AD3d 118, 121 [1st Dept 2009]).

In determining the existence of a valid contract, we begin with the examination of the communications between the parties. We find that the June 15, 2012 email sent by defendant's CEO, Ertel, was not merely an incident in "preliminary negotiations," but an actual offer for the renewal of the 2009 employment agreement. Not only did Ertel characterize it as an offer that was made under "the same terms [as the] existing contract," but he specified the material terms of the employment contract: the period of employment, the yearly base salary, the sign on bonus, the minimum yearly compensation, and the production bonus.

When viewed in light of contract law principles that "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it," (Restatement [Second] of Contracts § 24), Ertel's June 15, 2012 email can hardly be construed otherwise than extending to plaintiff the power to accept. Regarded in this context, plaintiff's subsequent purported acceptance by his July 16, 2012 email to Ertel, "I accept [please] send [the] contract," in reply to the June 15, 2012 email, must be interpreted as an acceptance of the offer, to which Ertel immediately replied, stating in full, "Mazel, looking forward to another great run."[2]

"As a general rule, in order for an acceptance to be effective, it must comply with the terms of the offer and be clear,

---

2. Mazel is an obvious reference to "Mazel tov" or "mazal tov," a Hebrew or Yiddish phrase used to express congratulations for a happy and significant occasion or event.

unambiguous and unequivocal" (*King v King*, 208 AD2d 1143, 1143-1144 [3d Dept 1994], citing 21 NY Jur 2d, Contracts § 53 at 470 [1982], and 2 Richard A. Lord, Williston on Contracts § 6:10 at 68 [4th ed 1990]). Inasmuch as there was nothing unclear, ambiguous or equivocal about plaintiff's July 16, 2012 email in response to Ertel's June 15, 2012 email, it appears to constitute an effective acceptance. Hence, according plaintiff the benefit of every possible favorable inference, as we must do on a motion to dismiss pursuant to CPLR 3211 (a) (1) (*Weil, Gotshal & Manges, LLP*, 10 AD3d at 270), and viewed in the context of the parties' prior dealings, one may reasonably find that by the June 15-to-July 16, 2012 email exchange, the parties had entered into an agreement to renew plaintiff's employment for a new three-year term, carrying forward the existing compensation plan under the 2009 employment agreement.

The inquiry, however, does not end there. In order to argue for treating the contract formation process employed here as ineffective to bind it, defendant points out that, after the July 16, 2012 exchange, the parties entered into a long train of correspondence aimed at formalizing the contract, which never took place. However, to overcome the reasonable inference we draw from the language of the correspondence ending in the July 16, 2012 exchange—that the parties did indeed intend thereby to create a binding contract—defendant must do more than merely point to the circumstance that a formal document was contemplated: defendant must show either that both parties understood that their correspondence was to be of no legal effect or that plaintiff had reason to know that defendant contemplated that no obligations should arise until a formal contract was executed.

But defendant has referred to no documentary evidence conclusively establishing either of these possibilities. On the contrary, upon this record, no evidence has been shown that either party expressly reserved the right not to be bound prior to the execution of a formal writing. Nor does the language in their correspondence indicate an unambiguous intent not to be bound until a formal writing was executed by the parties. The mere fact that defendant often referred to the writing in progress as a "draft" is not dispositive here where other correspondence indicates that the parties may have had a different understanding. Indeed, on several occasions plaintiff expressed the view that he was not seeking to "negotiate" but that he was seeking either to clarify language or bring the language to

conform with the parties' actual performance under the 2009 employment agreement.

Defendant, however, argues that even if we find evidence supporting a contractual intent, a binding contract never came into being because too many important terms were left unsettled by the exchange of letters. In support of this contention defendant points to the subsequent difficulties the parties encountered in reaching agreement on certain terms. The law is clear that although the parties may intend to enter into a contract, if essential terms are omitted from their agreement, or if some of the terms included are too indefinite, no legally enforceable contract will result (*Cobble Hill Nursing Home v Henry & Warren Corp.*, 74 NY2d 475, 482 [1989], *cert denied* 498 US 816 [1990]; *Joseph Martin, Jr., Delicatessen v Schumacher*, 52 NY2d 105, 109 [1981]; *see also* Restatement [Second] of Contracts § 33 [2]). But it is also plain that all the terms contemplated by the agreement need not be fixed with complete and perfect certainty for a contract to have legal efficacy (*Cobble Hill Nursing Home* at 483; *see also* 21 NY Jur 2d, Contracts § 20; 1 Corbin on Contracts § 95 [1950]).

In this case, as indicated, it appears that all of the terms essential to the agreement were specified in the June 15, 2012 email intended to be an offer, and which plaintiff accepted (*see Geller v Reuben Gittelman Hebrew Day School*, 34 AD3d 730, 731 [2d Dept 2006] [material terms of employment agreement include "salary and the amount of services required"]). This militates toward plaintiff's contention that the parties initially did reach an agreement on all material terms, even though there might not have been a meeting of the minds on all details of the agreement (*see Aiello v Burns Intl. Sec. Servs. Corp.*, 110 AD3d 234, 242-243 [1st Dept 2013]).

Indeed, the initial proposed changes appeared to be simple clarifications and modifications that would not necessarily indicate a lack of meeting of the minds on the essential terms. For instance, in the first draft defendant inserted a clawback clause intended to modify the "Sign On Bonus" provision. The clawback clause, however, did not alter the amounts of the periodic "Sign On Bonus." Instead, the clawback clause simply provided that each periodic bonus was contingent upon the employee remaining employed until the end of each "Sign On Bonus" period. Initially, plaintiff did not find the modification objectionable. Plaintiff only sought clarification that the clawback did not apply if he was terminated without cause or he

resigned for good reason. Defendant accepted this clarification even though the employer found it unnecessary because "that protection [was] already in there for you."

In the first draft, defendant also included a modification of the 2009 guarantee payment provision. As the language indicates, such provision guaranteed that plaintiff would receive a minimum combined payment of salary and bonuses totaling $750,000. If the combined salary and bonuses paid to plaintiff for a specific year did not reach the $750,000 threshold, the difference would constitute a "Make Whole Payment" due to plaintiff at the end of the year. The 2009 agreement, however, contained a "For the avoidance of doubt" clause. The clause inured to plaintiff's benefit since it provided that the production bonus that he earned during the second trimester of 2009 would not be included in the "guaranteed compensation" calculation. Defendant did not seek to significantly alter the 2009 guarantee provision; it simply sought to remove the "For the avoidance of doubt" clause from the provision because the clause was "unique" to the 2009 agreement. It had been inserted to the 2009 employment agreement to compensate for the fact that plaintiff's "bonus structure had changed" when such contract was signed. Since the "avoidance of doubt" modification involved a single trimester of production bonus, which, as defendant acknowledged, was unique to the 2009 employment agreement, it cannot be viewed as a significant change to the guaranteed compensation scheme.

Plaintiff also complained about defendant's purported insertion of a second modification to the guaranteed compensation scheme. Specifically, plaintiff complained about the inclusion of the noncompete payment—which would have been triggered if he was terminated without cause or he quit with a good reason—as an amount to be factored, along with base salary and bonuses, in the computation of the "Make Whole Payment" due to plaintiff. However, plaintiff was under the misimpression that this was a modification of the guaranteed compensation provision of the 2009 agreement. The 2009 agreement explicitly provided that any amount due to plaintiff as a special noncompete payment would count toward the guaranteed compensation calculation during the last year of the contract.

In retrospect, it appears that the only significant change upon which the parties faltered was defendant's attempt to increase the period of the non-solicit restrictive covenant from 9 to 18 months following the noncompete period. On its face,

such modification clearly appears to be a material change of the terms of the non-solicit restrictive covenant. However, plaintiff contends that such last minute modification was an attempt by defendant to renege on the contract by introducing a drastic change that it knew plaintiff was never going to accept, presumably as financially onerous.

█ If plaintiff's contention is the correct characterization of the parties' negotiations, such impasse on a drastic new change does not necessarily defeat the original agreement of the parties. An agreement is still binding if a party has a change of heart between the time of agreeing to the terms of the agreement and the time those terms are reduced to writing (*see Kowalchuk v Stroup*, 61 AD3d at 122-123). Once the renewal agreement is reached, however, it may not be repudiated by either party. Rather, such agreement must be enforced.

Contrary to the dissent's mischaraterization, we do not hold "that the terms on which the parties failed to agree simply don't matter." Rather, we simply hold that defendant has not established, as a matter of law, that by their emails and other correspondence, that the parties never entered into a valid employment renewal contract and that, instead, their aborted negotiation efforts were intended to reach a new agreement. On the contrary, if we accord to plaintiff the benefit of every possible favorable inference, as we must do on a motion to dismiss pursuant to CPLR 3211 (a) (1) (*Weil, Gotshal & Manges, LLP*, 10 AD3d at 270), we find that the emails and other correspondence support an inference that the parties were engaged in attempts to formalize the binding extension agreement in a more formal instrument (*see Kowalchuk*, 61 AD3d at 123 ["binding agreement that is nevertheless to be further documented . . . is enforceable with or without the formal documentation" (internal quotation marks omitted)]).[3]

---

3. The cases cited by the dissent to support its position are easily distinguishable on the facts. For instance, in *Spier v Southgate Owners Corp.* (39 AD3d 277, 278 [1st Dept 2007]), this Court found that the defendant's letter was not a contract; it simply referred to " 'possible' sale of air rights and the advice that it 'will not consider a sale' of less than a certain square footage did not manifest a present intent to be bound." In *Galesi v Galesi* (37 AD3d 249, 249 [1st Dept 2007]), this Court found that while the "plaintiffs presented evidence that the negotiating parties had agreed as to price and quantity, the exchange of drafts, further discussion, and the totality of the circumstances clearly showed that there was never a meeting of the minds on all essential terms." In *Yenom Corp. v 155 Wooster St. Inc.* (23 AD3d 259, 259-260 [1st Dept 2005], *lv denied* 6 NY3d 708 [2006]), this Court found that

Even if we were to agree with the dissent that the parties never entered into an extension of the 2009 employment agreement, we would still find that defendant's documentary evidence does not establish, as a matter of law, that plaintiff was not entitled to a production bonus for work done prior to termination of the 2009 employment agreement. Defendant claims that plaintiff was not entitled to the production bonus because payment of the bonus was contingent upon plaintiff being "actively employed by [defendant] at the time of [defendant's] firm-wide bonus payment," which took place after the 2009 employment agreement expired. Plaintiff, however, claims that the production bonus was "incentive compensation." Plaintiff's contention is supported by contractual language stating that the production bonus was "based on [plaintiff's] performance" and calculated as "no less than 55% of the Net Earnings of the Desk" that plaintiff managed. Thus, if plaintiff's contention is correct that the production bonus was actually earned through his own performance, plaintiff would be entitled to such bonus as wages, which are not subject to forfeiture (*see Ryan v Kellogg Partners Inst. Servs.*, 19 NY3d 1, 16 [2012] [Court held that "bonus (that) was expressly link(ed) to (employee's) labor or services personally rendered . . . had been earned and was vested before he left his job . . . (and) its payment was guaranteed and non-discretionary as a term and condition of his employment" (internal quotation marks omitted)]; *Weiner v Diebold Group*, 173 AD2d 166, 167 [1st Dept 1991] ["the long standing policy (in the state) against the forfeiture of earned wages . . . applies to earned, uncollected commissions as well"]; *see also* Labor Law § 190 [1]). Thus, given the conflicting language concerning the nature of the bonus payment, this issue presents a question of fact.

---

"even if there were no intent to be bound only upon execution of a formal contract, the many substantial changes to [the] draft that were prepared by plaintiff's counsel and the parties' subsequent correspondence establish that there was never a meeting of the minds on material terms, including price." In *Yenom Corp.*, this Court also found it significant that "one section of the draft that plaintiff's counsel did not alter was that requiring execution and delivery of a formal contract" (*id.* at 260). Finally, in *Dratfield v Gibson Greetings* (269 AD2d 294, 295 [1st Dept 2000]), this Court found that "[t]he parties' correspondence and the surrounding circumstances establish that they did not intend to be bound until their agreement was reduced to writing and formally executed." This Court found it significant that "[a]lthough neither party expressly reserved the right not to be bound prior to the execution of the signed contract, the language used in both of defendant's March letters establishes an intention to be bound only after a formal signing"; thus summary dismissal was properly granted (*id.*).

■ We find, however, that defendant met its burden of establishing that plaintiff does not have a claim under the 2009 employment agreement for a special noncompete payment. The 2009 employment agreement provided for this payment to be made "[i]n the event" that plaintiff was "terminated by [defendant] prior to the Ending Date *without cause.*" It is undisputed that plaintiff's employment terminated on September 1, 2012, after the 2009 agreement's "Ending Date" of August 31, 2012. Thus, in accordance with the agreement's plain language, plaintiff is not entitled to any special noncompete payment under the 2009 employment agreement.

Accordingly, the order of the Supreme Court, New York County (Eileen Bransten, J.), entered August 22, 2013, which, insofar as appealed from, denied defendant's motion to dismiss the first cause of action for breach of contract, should be modified, on the law, to dismiss so much of the cause of action as seeks to recover a special noncompete payment under plaintiff's 2009 employment agreement, and otherwise affirmed, without costs.

FRIEDMAN, J.P. (dissenting). In affirming the denial of defendant's motion, pursuant to CPLR 3211 (a) (1), to dismiss plaintiff's cause of action for breach of contract, the majority recites many well-established propositions of the law of contracts with which I fully agree. The majority disregards, however, the cardinal rule that whether a contract has been made must be determined in light of the " 'totality' " of the parties' conduct and communications (*Zheng v City of New York*, 19 NY3d 556, 572 [2012], quoting *Brown Bros. Elec. Contrs. v Beam Constr. Corp.*, 41 NY2d 397, 400 [1977]), without placing " 'disproportionate emphasis . . . on any single act, phrase or other expression' " (*Zheng*, 19 NY3d at 572, quoting *Brown Bros.*, 41 NY2d at 399-400). This rule requires dismissal of the breach of contract claim in light of the undisputed documentary evidence demonstrating that, when the parties broke off their negotiations for a possible extension of plaintiff's employment, they were unable to agree on certain terms that both sides regarded as essential. To be clear, the parties did not overlook these issues, nor did they decide to revisit them in the future, if necessary, while nonetheless going forward with a new agreement. They were consciously deadlocked on these matters, and neither side would give way. As a matter of law, this failure to agree on essential terms is fatal to plaintiff's attempt to enforce any alleged agreement to extend his employment, "not because

of lack of definiteness, but because of lack of assent" (1 Farnsworth on Contracts § 3.27 at 419 [3d ed 2004]).[1]

No contract can come into existence without "a manifestation of mutual assent to [its] essential terms" (*Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.*, 93 NY2d 584, 590 [1999] [internal quotation marks omitted]; *see also e.g. Galesi v Galesi*, 37 AD3d 249, 249 [1st Dept 2007]). Here, the totality of the undisputed documentary evidence of the parties' negotiations submitted in support of the CPLR 3211 (a) (1) motion to dismiss—comprising 20 emails, one letter and two drafts exchanged during the period from June 15 through August 23 of 2012—establishes, as a matter of law, that, far from ever reaching a meeting of the minds, the parties ended their discussions in a state of affirmative and express *disagreement* on several terms they both deemed essential to a possible extension of their contractual relationship. Thus, the documentary evidence of the negotiations, viewed as a whole, "utterly refutes" (*Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 326 [2002]) plaintiff's allegation that he and defendant, as the result of an exchange of three sketchy emails at the outset of their discussions, entered into an enforceable agreement for a new three-year term of employment, notwithstanding their subsequent documented and undisputed failure to agree on all essential terms.

The conclusion that the documentary evidence submitted by defendant utterly refutes plaintiff's claim, so as to render appropriate dismissal pursuant to CPLR 3211 (a) (1), is inescapable. First, plaintiff was necessarily a party to each and every step of this bilateral negotiation, and he thus has direct knowledge of the entire course of the negotiations. Second, notwithstanding his direct knowledge of all that transpired between

1. Using as an example the negotiation of a hypothetical sale of apples, the late Professor Farnsworth, who was the Reporter of the Restatement (Second) of Contracts, wrote:

"It is essential to distinguish [from indefiniteness] one other cause of incompleteness of agreement—a failure to agree. If the seller and the buyer of apples do discuss the matter of the seller's responsibility for their quality and are unable to agree on how that matter is to be resolved, the incompleteness of their agreement in that respect will be fatal to the enforceability of their agreement—not because of lack of definiteness, but because of lack of assent. There is a critical distinction between remaining silent on such a matter and discussing it but failing to agree" (1 Farnsworth on Contracts § 3.27 at 419-420).

himself and defendant in those discussions, plaintiff makes no claim that the documentary evidence before us gives a picture of the negotiations that is in any way either inaccurate or incomplete. In particular, plaintiff does not assert that any of the issues left unresolved in the email record supporting the motion were subsequently resolved, either orally or through written communications that defendant has not submitted. Rather, plaintiff's position is that the parties' documented and undisputed inability to resolve their differences on issues they both regarded as essential to concluding an agreement should not prevent him from suing on that putative agreement. Stated otherwise, plaintiff is arguing that he should have a chance to persuade a factfinder to make for the parties a bargain that—as established by undisputed documentary evidence—the parties themselves could not reach. I see no reason to extend proceedings on a claim so lacking in legal merit. Accordingly, we should reverse the order appealed from and grant defendant's motion to dismiss the breach of contract cause of action pursuant to CPLR 3211 (a) (1). I respectfully dissent from the majority's failure to do so.[2]

The majority can only reach its result by putting "disproportionate emphasis" on the aforementioned three emails while disregarding the documentary evidence of the parties' ensuing negotiations, including 17 emails exchanged during the period from July 20 to August 23, 2012.[3] Those subsequent emails conclusively establish that, contrary to the premise of plaintiff's

---

**2.** For reasons more fully discussed at the end of this writing, I also disagree with the majority's failure to dismiss plaintiff's breach of contract cause of action insofar as he seeks to recover thereunder a discretionary production bonus for the second trimester of 2012 under the parties' 2009 employment agreement, the term of which expired on Aug. 31, 2012, before any such bonus became payable. The parties' 2009 agreement expressly conditioned plaintiff's eligibility for the bonus in question on his being "actively employed by [defendant] at the time of [the] firm-wide bonus payment date[ ]."

**3.** In fact, the majority inaccurately simplifies the documented sequence of events. It fails to mention that, after defendant sent plaintiff an email on June 15, 2012, proposing to extend his employment for another three-year term on "the same terms [as] of your existing contract" (subject to clarification on one point), plaintiff's initial response was essentially to reject the proposal. Specifically, plaintiff sent defendant a one-sentence letter, dated June 22, 2012, stating: "Please accept this letter as notification per section 2.4 of my existing employment agreement that I do not wish to extend my employment agreement under its existing terms." Thus, when plaintiff subsequently sent defendant his email of July 16, 2012, stating, "I accept, pls send contract," his rejection of June 22 had already terminated his power to accept any offer that might have been extended by defendant's June 15 email (*see*

claim, neither party intended simply to renew the terms of their previous agreement (the 2009 agreement) for a new three-year term to begin on September 1, 2012, the day following the final date of the term of the 2009 agreement. Rather, in those negotiations, both parties—plaintiff no less than defendant—proposed terms that varied substantially from the terms of the 2009 agreement. And, to reiterate, the parties ultimately could not agree on all of the terms they regarded essential for a new term of employment. Thus, the full course of the parties' negotiations demonstrates that their initial exchange ending on July 16, 2012—on which the majority relies to the exclusion of the rest of the record—left open essential terms on which no meeting of the minds subsequently could be reached. In view of the parties' ultimate inability to agree on the essential terms "left open" by the early emails singled out by the majority, those communications plainly were "not intended to be understood as an offer or as an acceptance" (Restatement [Second] of Contracts § 33 [3]).

It is telling that, at the outset of the negotiations, plaintiff did not object that an agreement to renew the terms of the 2009 agreement had already been reached when, by email dated July 20, 2012, defendant first sent him a draft for a new contract that included at least three significant changes from the terms of the 2009 agreement. Plaintiff did raise objections to two of the changes proposed by defendant, namely, (1) a new provision for "clawback" of the sign on bonus in the event of termination for cause or unprovoked resignation and (2) the deletion of a provision that payment of the bonus for the previous contract year would not count against guaranteed minimum compensation for the year in which the payment was made. Notwithstanding plaintiff's opposition to these particular proposals, he did not assert that defendant had no right to propose changes to the terms of the 2009 agreement. In fact, plaintiff proposed a different "clawback" provision that, while

Restatement [Second] of Contracts § 38 [1] ["An offeree's power of acceptance is terminated by his rejection of the offer, unless the offeror has manifested a contrary intention"]). Thus, if there were any offer and acceptance here—and, in my view, the totality of the record negates that possibility—it was plaintiff's July 16 email that would have constituted the offer (reviving, as plaintiff's counteroffer, defendant's terminated proposal of June 15) and defendant's responding email of the same date ("Mazel. Looking forward to another great run") that would have constituted the acceptance. But, to reiterate, the parties' subsequent correspondence establishes that they never reached agreement on all essential terms for the contemplated new term of employment and, therefore, no enforceable contract came into being.

more favorable to him than defendant's proposal, had not been present in the 2009 agreement.[4]

Ultimately, the record shows, at least three issues remained unresolved upon the expiration of the 2009 agreement at the end of August 2012, after negotiations reached a standstill on or about August 23. Two of those outstanding issues arose from proposals to deviate from the terms of the 2009 agreement that had been made by plaintiff himself, not defendant. These issues were (1) whether defendant would pay plaintiff, after the end of his employment, for the entire period during which he would be forbidden to communicate with defendant's clients and to solicit defendant's employees (three months and nine months, respectively, following the end of the compensated six-month noncompete period), and (2) whether plaintiff's post-employment "Special Non-Compete Payment" (as described in the majority's opinion) would count against his guaranteed minimum compensation. The parties were also deadlocked on defendant's proposal to extend by nine months the post-employment period during which plaintiff would be forbidden to solicit defendant's employees.

While the majority makes light of the importance of these issues, it is plain from the record that the parties considered them to be material and essential. For example, regarding his proposal that defendant compensate him during the entire period of post-employment restriction of contact with defendant's clients and employees (a benefit to which he was *not* entitled under the 2009 agreement), plaintiff told defendant in an August 17 email: "I cannot accept non compete language that prevents me from doing my or a job [sic] without getting paid." On its face, this was a demand by plaintiff for a substantive change from the terms of the 2009 agreement, not just a proposal to "tinker with language that was written 3 yrs ago," as he inaccurately characterized his proposals in an August 23 email, the final documented communication of the negotiations

---

4. Before the negotiations broke off, the parties apparently resolved their differences over the "clawback" of the sign on bonus and the effect on the guarantee for a given year of a bonus paid on account of the previous year (defendant prevailed on the first issue, plaintiff on the second). That the parties ultimately resolved their differences over these issues does not change the fact that plaintiff treated these matters as legitimate subjects for negotiation.

in the record, which he sent as the August 31 expiration date of the term of the 2009 agreement loomed only eight days away.[5]

I agree with the majority insofar as it articulates the hornbook principle that, where the parties to an alleged contract have agreed on all essential terms of an agreement, their failure to carry out their intention to memorialize those terms in a formal, signed writing will not necessarily render their informal agreement unenforceable, provided that neither party has expressly reserved the right not to be bound in the absence of such formal documentation. I also accept, for present purposes, the majority's view that the documentary evidence upon which defendant moved for dismissal does not include an express reservation by either party of the right not to be bound until a formal written contract had been executed (*cf. Jordan Panel Sys. Corp. v Turner Constr. Co.*, 45 AD3d 165 [2007]). This, however, does not mean that the emails of June 15 and July 16, which plaintiff contends gave rise to a binding agreement to extend the terms of the 2009 agreement, can support such an inference in the face of the undisputed documentary evidence, as described above, that both parties contemplated substantial changes to the terms of the 2009 agreement and that each side regarded the issues that remained outstanding at the end of their negotiations as deal breakers. Even if the June 15 and July 16 emails could support plaintiff's position when viewed in isolation, such support evaporates, as a matter of law, in the context of "the totality of [the parties' undisputed acts and words], given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain" (*Brown Bros.*, 41 NY2d at 400). Stated otherwise, the documentary evidence of the whole course of the parties' dealings establishes that, notwithstanding what might otherwise appear from three brief emails artificially detached from the communications that followed, the parties never reached a meeting of the minds to extend the terms of the 2009 agreement for another three years, nor did they reach a meeting of the minds on all essential terms of a successor agree-

---

5. In the same August 23 email, plaintiff suddenly changed his tune and, after more than a month of proposals and counter-proposals for changes from the terms of the 2009 agreement, told defendant: "Actually I don't want to negotiate. I think we agreed to terms." This self-serving assertion is utterly inconsistent with plaintiff's documented course of conduct over the previous month and, in view of the documentary evidence of the parties' negotiations, gives no support to an inference that the parties had agreed, on July 16, simply to renew the terms of the 2009 agreement.

ment.[6] Since, according to the complaint itself, the fundamental premise of the cause of action for breach of contract is that the parties agreed on July 16, 2012 to extend the terms of the 2009 agreement, the disproof of this assertion by the documentary evidence is fatal to the claim.

It bears emphasis that the absence of an express reservation of the right not to be bound before the execution of a formal, written agreement does not mean that the existence of an enforceable agreement cannot be negated, as a matter of law, by uncontroverted evidence of the parties' negotiations after the promise sought to be enforced allegedly was made, as this Court, among other New York courts, has ruled numerous times (*see Spier v Southgate Owners Corp.*, 39 AD3d 277, 278 [1st Dept 2007] ["(t)he parties' further negotiations showed that there was never a meeting of the minds on all essential terms"]; *Galesi*, 37 AD3d at 249; *Yenom Corp. v 155 Wooster St. Inc.*, 23 AD3d 259, 259-260 [1st Dept 2005] ["(E)ven if there were no intent to be bound only upon execution of a formal contract, the many substantial changes to Cooper's draft that were prepared by plaintiff's counsel and the parties' subsequent correspondence establish that there was never a meeting of the minds on material terms"], *lv denied* 6 NY3d 708 [2006]; *Dratfield v Gibson Greetings*, 269 AD2d 294, 295 [1st Dept 2000] [affirming summary judgment dismissing a claim for breach of contract notwithstanding that "neither party expressly reserved the right not to be bound prior to the execution of the signed contract"]; *May v Wilcox*, 182 AD2d 939, 940 [3d Dept 1992] [no contract came into existence as the result of a written offer because, "(a)s evidenced . . . by the ongoing correspondence between the parties' attorneys as well as the parties' discussions, there was no meeting of the minds with respect to" certain essential terms]; *see also CAC Group Inc. v Maxim Group LLC*, 523 Fed Appx 802, 804 [2d Cir 2013] [in a case governed by New York law, affirming the dismissal of an action to enforce an unsigned agreement for the sale of a promissory note "(a)lthough neither party expressly reserved the right not to be bound prior to the execution of a document" (internal quotation marks omitted)]).

An instructive illustration of the foregoing principle is provided by the above-cited case of *Galesi* (37 AD3d 249), in

---

**6.** *See e.g. Flores v Lower E. Side Serv. Ctr., Inc.*, 4 NY3d 363, 369-370 (2005) ("the common-law rule . . . authorizes review of the course of conduct between the parties to determine whether there was a meeting of minds sufficient to give rise to an enforceable contract").

which this Court affirmed a judgment dismissing a complaint for breach of contract pursuant to a grant of summary judgment to the defendants. In so doing, we held that the record established that the parties had made, at most, "an indefinite and unenforceable 'agreement to agree' " (*id.* at 249). We explained that, even "[a]ssuming that the alleged promise was made," and notwithstanding evidence that the parties had reached agreement on some terms, "the exchange of drafts, further discussion, and the totality of the circumstances clearly showed that there was never a meeting of the minds on all essential terms" (*id.*). Similarly here, the documentary evidence of the parties' negotiations establishes that, notwithstanding their July 16 "agreement to agree" on the terms of a new employment agreement, they were subsequently unable to agree on all of the terms they deemed essential to put such an agreement into operation upon the expiration of the contract then in force. It necessarily follows that no new agreement came into being, since, as the majority itself recognizes, "an enforceable contract requires mutual assent to its essential terms and conditions" (*Edelman v Poster*, 72 AD3d 182, 184 [1st Dept 2010]).

Remarkably, in purporting to distinguish "easily" the above-cited decisions of this Court in *Spier, Galesi, Yenom* and *Dratfield* based on " 'the totality of the circumstances' " (quoting *Galesi*) on which those cases were decided, the majority synopsizes the very point I am making. Here, as in the cited cases, the record presents us with more than just the terse email exchange that plaintiff claims to have given rise to a contract, and on which the majority focuses to the exclusion of the remainder of the record. We have before us the documentary record of more than a month of the parties' negotiations following what the majority regards as the decisive email of July 16, 2012, and plaintiff has disputed neither the accuracy nor the material completeness of this record. The Court of Appeals has instructed us to look to the " 'totality' " of this record, in light of " 'the attendant circumstances, the situation of the parties, and the objectives they were striving to attain' " (*Zheng*, 19 NY3d at 572-573, quoting *Brown Bros.*, 41 NY2d at 399-400), to determine whether plaintiff may be able to prove that he and defendant entered into a new agreement. When we do look to the totality of the record of the parties' dealings, however, we find—as we found in *Spier, Galesi, Yenom* and *Dratfield*—that the parties could not agree on all of the essential terms of the

agreement they contemplated. The inescapable conclusion is that no enforceable contract came into being.

Since it is plain from the totality of the documentary evidence of the parties' dealings that they did not agree, on July 16, 2012, to extend the terms of the 2009 agreement for another three years, and not even plaintiff claims that the parties reached a meeting of the minds on new terms at any subsequent time, I conclude that plaintiff's cause of action for breach of contract fails as a matter of law. Further, contrary to the majority's position that the terms on which the parties failed to agree simply don't matter, the record establishes that the parties regarded these terms as material and essential. Where "the parties have, in piecemeal fashion, reached [an] agreement on some terms but not on others, . . . there is a contract if the matters left open were not deemed material by the parties, and *there is not a contract if the matters left open were deemed material*" (*Four Seasons Hotels v Vinnik*, 127 AD2d 310, 317 [1st Dept 1987] [emphasis added], citing *Joseph Martin, Jr., Delicatessen v Schumacher*, 52 NY2d 105 [1981]).

In this case, whatever a reviewing court might think, the parties plainly regarded the issues on which unresolved differences remained when negotiations broke off as deal breakers. Again, those issues included (1) whether plaintiff would be paid during the entire post-employment period of restriction of contact with defendant's clients and employees, (2) whether his post-employment special noncompete payment would count against his minimum guaranteed compensation during the period of his employment, and (3) whether to extend the post-employment period during which plaintiff would be forbidden to solicit defendant's employees by nine months. The first two issues were changes from the terms of the 2009 agreement that plaintiff had proposed; the third was proposed by defendant. Hence, when the negotiations broke off in August, neither plaintiff nor defendant believed that they had already made a deal to extend the 2009 agreement on July 16. Since the existence of such a renewal agreement—the sole basis alleged in the complaint for plaintiff's breach of contract cause of action—is conclusively disproved by the undisputed documentary evidence (a point that the majority does not, and cannot, dispute), the claim should be dismissed.

Further, we cannot disregard the differences that remained between the parties upon the expiration of the 2009 agreement on the theory that these open terms could, if necessary, have

been resolved by judicial gap-filling. Such gap-filling is permissible only where "some objective method of determination [of the open term] is available, independent of either party's mere wish or desire" (*Metro-Goldwyn-Mayer v Scheider*, 40 NY2d 1069, 1071 [1976] [internal quotation marks omitted]; *see also Matter of 166 Mamaroneck Ave. Corp. v 151 E. Post Rd. Corp.*, 78 NY2d 88, 91 [1991] [judicial filling of gaps in a contract is appropriate "where it is clear . . . that the parties intended to be bound and there exists an objective method for supplying a missing term"], quoted in *Aiello v Burns Intl. Sec. Servs. Corp.*, 110 AD3d 234, 244 [1st Dept 2013, Renwick, J.]). In this case, the issues that remained unresolved between the parties when their negotiations ended do not appear susceptible to such resolution, and "a court, in intervening [to supply the missing terms], would be imposing its own conception of what the parties should . . . have undertaken" (*Joseph Martin, Jr., Delicatessen*, 52 NY2d at 109), rather than enforcing a bargain the parties themselves had made.

Although my colleagues deny it, by allowing plaintiff's breach of contract claim to go forward notwithstanding the parties' undisputed and documented failure to reach a meeting of the minds on a number of terms that *the parties themselves* regarded as essential, the majority treats those essential but disputed terms—terms that, as noted, cannot be supplied through judicial gap-filling on any objective basis—as nullities. In essence, the majority holds that, because the parties agreed on most of the terms for a new period of employment, plaintiff is entitled to ask a factfinder to dictate to the parties the open terms on which they failed to agree and then to award plaintiff damages for defendant's failure to perform the agreement thus imposed on the parties by the judicial system. This approach is contrary to the settled law of this state.

"To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to *all* material terms" (*Express Indus.*, 93 NY2d at 589 [emphasis added], citing *Joseph Martin, Jr., Delicatessen*, 52 NY2d at 109). In *Express Indus.*, for example, the Court of Appeals held, as a matter of law, that no contract had been created by one party's execution of a writing supplied by the other party that "omitted material terms of the purported contract" (*id.* at 586). In so holding, the Court of Appeals rejected the view of the Appellate Division majority that the items left blank in the writing simply raised

"an issue of fact" (*id.* at 589 [internal quotation marks omitted]), noting that Express, the proponent of the alleged contract, had not suggested any objective basis for supplying the omitted terms (*id.* at 590). Further, the Court of Appeals observed that the open issue had been "identified by Express as a deal breaker" (*id.* at 591). Similarly, here, where the documentary record of the negotiations establishes that the parties could not agree on certain material terms, and that each side regarded these open issues as deal breakers, as a matter of law, no binding contract came into being.

I also disagree with the majority's view that plaintiff should be permitted to seek to recover a production bonus for the second trimester of 2012 (which ended on Aug. 31, 2012) under the expired 2009 agreement. This claim is distinct from plaintiff's cause of action alleging that the parties entered into an agreement for a new term of employment commencing on September 1, 2012, or that they agreed to extend the 2009 agreement past its termination date of August 31, 2012. Rather, the claim for the production bonus is based on the 2009 agreement's provision that made plaintiff "eligible to be paid a bonus on a trimester basis" out of a bonus pool for his department, "within two months of the close of a given trimester," which, in this case, was October 31, 2012.[7] However, the 2009 agreement expressly conditions plaintiff's eligibility for payment of a production bonus on his being "actively employed by [defendant] at the time of our firm-wide bonus payment dates," a condition that plainly was not satisfied here, since both parties understood that plaintiff (whether rightly or wrongly) was no longer defendant's employee as of October 31, 2012. Accordingly, plaintiff is not entitled to recover a production bonus for the second trimester of 2012.

The majority holds that plaintiff is entitled to seek to recover a production bonus for the second trimester of 2012, notwithstanding the contractual condition that he be "actively employed" by defendant on the date the bonuses for a given

---

**7.** Contrary to the impression conveyed by the majority's description, the production bonus provision of the 2009 agreement did not entitle plaintiff personally to "no less than 55% of the Net Earnings of the [renewable energy brokerage] Desk." Rather, plaintiff, along with the other traders working under him, was eligible for a bonus payment out of a pool to be funded in that amount, as becomes clear when one reads the entire sentence from which the quoted words are excerpted: "The total bonus pool available to the Eastern U.S. renewable energy brokerage desk (the 'Desk') will be no less than 55% of the Net Earnings of the Desk."

trimester are paid, based on its view that plaintiff may be able to prove that he is "entitled to such bonus as wages, which are not subject to forfeiture." The terms of the 2009 agreement defeat this claim as a matter of law.[8] While the 2009 agreement describes the production bonus as "based on your performance," the bonus was plainly discretionary, as no formula was provided for calculating plaintiff's bonus (as opposed to the amount of the bonus pool for the entire department). That plaintiff's superiors considered his performance in determining his production bonuses (which is hardly surprising) did not change the discretionary nature of the payment. Nor does plaintiff allege that his production bonus for the second trimester of 2012 had been allocated while his employment was still ongoing, so he cannot claim that his right to the bonus had become vested before his employment came to an end.

The discretionary nature of the bonus, and the fact that plaintiff's entitlement to it had not vested before he left defendant's employ, distinguish this case from the decisions on which the majority relies (*Ryan v Kellogg Partners Inst. Servs.*, 19 NY3d 1, 16 [2012] [the plaintiff was entitled to recover a bonus that "was vested before he left his job" and the payment of which "was guaranteed and non-discretionary"]; *Weiner v Diebold Group*, 173 AD2d 166 [1st Dept 1991] [the plaintiff sued to recover deferred payments of a previously awarded bonus that his former employer had refused to make]). The controlling precedent with respect to plaintiff's bonus production claim is *Truelove v Northeast Capital & Advisory* (95 NY2d 220 [2000]), which recognizes that receipt of a discretionary bonus may lawfully be conditioned on continued employment at the time of payment. I would follow that rule in this case.

For the foregoing reasons, I believe that we should reverse the order appealed from and grant defendant's motion to dismiss plaintiff's cause of action for breach of contract pursuant to CPLR 3211 (a) (1). Accordingly, I respectfully dissent.

MOSKOWITZ, RICHTER and FEINMAN, JJ., concur with RENWICK, J.; FRIEDMAN, J.P., dissents in a separate opinion.

Order, Supreme Court, New York County, entered August 22, 2013, modified, on the law, to dismiss so much of the first cause of action for breach of contract as seeks to recover a special

---

**8.** Although the majority states that an issue of fact is presented concerning the production bonus claim "given the conflicting language concerning the nature of the bonus payment," it does not specify what "conflicting language" is referred to.

noncompete payment under plaintiff's 2009 employment agreement, and otherwise affirmed, without costs.